COMMONWEALTH *vs.* HOMER JOHNSON, JR.

Suffolk.    November 11, 1974. — April 23, 1975.

Present: HALE, C.J., ROSE, KEVILLE, GRANT, & ARMSTRONG, JJ.

*Evidence,* Relevancy and materiality, Admissions and confessions. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Waiver. Homicide. Malice.*

At a murder trial, there was no error in the admission of testimony by a psychiatrist who had examined the defendant some two and a half weeks after the murder that at the time of the examination the defendant did not exhibit mental illness and was competent to stand trial. [228-229]

Despite the defendant's borderline intelligence or his suggestion that he may have been drugged when he was questioned by the police, a knowing and intelligent waiver of his right to counsel could be inferred from his proceeding to make a statement to police after being told of the *Miranda* rights and acknowledging his understanding of those rights, where there was substantial evidence that the defendant had the capacity to understand, and did in fact understand, what was transpiring. [229-231]

At a murder trial, where the only evidence of the defendant's guilt was his statement to the police which showed that the victim was the aggressor and that the defendant's intention to stab him was formed in the heat of sudden combat, the absence of any evidence of malice made out a case of voluntary manslaughter, and it was error to deny the defendant's motion for a directed verdict as to so much of the indictment as charged murder in the second degree. [231-233]

INDICTMENT found and returned in the Superior Court on June 7, 1973.

The case was tried before *Tamburello, J.*

*Calvin J. Wier* for the defendant.

*D. Lloyd Macdonald,* Assistant District Attorney, for the Commonwealth.

ARMSTRONG, J.    The defendant was convicted of murder in the second degree for the killing of one Matt Mayes on

the morning of March 24, 1973. Police, called to the scene
in the Roxbury district of Boston, found Mayes on the
front landing of his house, bleeding from the chest. Several
persons were there, including Mayes' wife; someone di-
rected the police to the defendant's residence just around
the corner.[1] There were drops of blood leading from Mayes'
front landing to the defendant's apartment, where the
police found the defendant, noticed that he was bleeding
from his right hand, arrested him for the murder (by stab-
bing) of Mayes, informed him of his *Miranda* rights, and
asked him if he had the murder knife, which he denied. At
the police station, in the presence of a stenographer, the
defendant was again given the *Miranda* warnings and was
then interrogated for approximately ten minutes. He ad-
mitted stabbing Mayes in a fight instigated by Mayes, who
attacked the defendant with a knife, and witnessed (the
defendant said) by several persons whom he named, in-
cluding Mayes' wife and the defendant's brother-in-law.
The defendant said that he did not know where he got the
knife with which he stabbed Mayes. He surmised that one
of the eyewitnesses might have given it to him or that he
might have succeeded in taking Mayes' knife during the
combat. The defendant denied being under the influence of
drugs or alcohol, and appeared to the police to be in full
possession of his faculties, although upset and remorseful
about the killing. He did not sign a written statement.

By Monday, March 26, the date scheduled for arraign-
ment, the defendant's behavior had become hostile and
marked by violent outbursts. On recommendation of a
court clinic psychiatrist, the defendant was committed to
the Bridgewater State Hospital for observation to deter-
mine his competency to stand trial and his criminal respon-

---

[1] The record reveals nothing more of what these persons told the
police, and none of them, and none of the persons whom the defendant
claimed witnessed the stabbing, appeared at the trial in March, 1974.
A police officer produced evidence of the death of one of the eyewit-
nesses and stated that the police had searched for others but had been
unable to find them.

sibility. See G. L. c. 123, § 15(b), as in effect prior to St. 1973, c. 569, §§ 5 and 6. He was determined to be competent to stand trial.

The Commonwealth's case was brief. Two police officers described what they had observed at the scene of the crime and the arrest of the defendant. A psychiatrist from the Bridgewater State Hospital was permitted to testify concerning the mental condition of the defendant, apparently for the purpose of establishing the voluntariness of the statement made by the defendant at the police station. The police officer who had interrogated the defendant then introduced the statement. The Commonwealth then rested.[2]

This appeal (taken under G. L. c. 278, § 33B) raises three issues: (1) the admissibility of the psychiatrist's opinion before the jury, (2) the admissibility of the defendant's statement at the police station, and (3) the denial of the defendant's motion, at the close of the Commonwealth's case, for a directed verdict as to so much of the indictment as charged murder in the second degree.

1. The psychiatrist examined the defendant on April 10, 1973, and on the basis of that examination and results of various tests performed by others, testified that on April 10 the defendant, although of borderline intelligence (I.Q. 73), did not exhibit mental illness or disturbance and appeared to understand the nature of his acts and of the criminal proceedings in which he was involved. The psychiatrist specifically declined, however, to draw any inference or express any opinion concerning the mental condition of the defendant on March 24 (when the homicide occurred

---

[2] The defendant took the stand in his own behalf, denied remembering making the statement at the police station, and gave a story in conflict with it. Its gist was that the defendant had gotten the cut breaking up a knife fight between Mayes and two men whom Mayes suspected of improper involvement with Mayes' wife, that Mayes was uninjured when the defendant left to go home, that the defendant knew nothing more until the police arrived at his door an hour or so later, and that his inability to remember what took place at the police station was due to his shock at hearing of Mayes' death or possibly to his having consumed (unbeknownst to him) a drug dissolved in a friend's beer (which he drank in front of Mayes' house) or in coffee given him at the police station.

and the defendant made his statement at the police station) or March 26 (when the arraignment was postponed). Nevertheless, the opinion was relevant and properly admitted, for evidence of the defendant's competency on April 10, if accepted, makes his competency on March 24 "more probable than it would be without the evidence." McCormick, Evidence, § 185, p. 437 (2d ed. 1972).

2. The defendant argues that, although the *Miranda* warnings, as set out in the margin,[3] were given before he made his statement at the police station, the record does not demonstrate knowing and intelligent waiver by him of his rights. He argues from the following passage in *Miranda* v. *Arizona*, 384 U. S. 436, 470 (1966): "An individual need not make a pre-interrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given." And again, at 475: "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver."

---

[3] "Q I informed you you're under arrest and charged with murder, and before we ask you any questions, you must understand your rights. A Yes. Q I'm going to read from the Miranda warning card, and I want you to answer after each right whether or not you understand it. Do you understand that? A Yes. Q You have a right to remain silent. Do you understand that? A Yes. Q Anything you say can be used against you in court. Do you understand that? A Yes. Q You have the right to talk to a lawyer for advice before we ask you any questions and to have him here with you during questioning. Do you understand that? A Yes. Q If you cannot afford a lawyer, one will be appointed for you before any questioning is started, if you wish. Do you understand that? A Yes. Q If you decide to answer questions now without a lawyer present, you still have the right to stop answering questions at any time until you talk to a lawyer. Do you understand that? A Yes. Q Do you understand everything I have read to you from this card? A Yes. Q Are you willing to talk to me about the case and the incident you're now under arrest for? A Yes." The warnings appear to have been taken from the *"Miranda* card" the text of which has been treated as adequate in numerous cases, including *Commonwealth* v. *Scott,* 355 Mass. 471, 478-479 (1969); *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 264-265 (1970); *Commonwealth* v. *Preston,* 359 Mass. 368, 372, and n. 2 (1971); and *Commonwealth* v. *Roy,* 2 Mass. App. Ct. 14, 17-20 (1974).

The defendant points out that he was never asked, in so many words, "Do you wish to have a lawyer present?" or "Do you wish to answer questions without having a lawyer present?" The defendant concedes, as he must, that the *Miranda* case does not require that those questions be asked. The warnings the defendant was given have been held sufficient on many occasions. See n. 3. Rather, the defendant argues that by such questions the Commonwealth might have demonstrated a waiver of rights, and that by failing to ask such questions the most that the Commonwealth can be said to have demonstrated is an understanding (but not a waiver) of rights.

The contention is forcefully and skillfully presented, and, if this were a case of first impression, we would have difficulty in reconciling the facts of this case with the language quoted from the *Miranda* case. But a long line of cases in various Federal Courts of Appeal appears to have established a working rule that, if the record demonstrates that a defendant has been clearly and accurately told of the *Miranda* rights and that he has affirmatively acknowledged his understanding of those rights, a knowing and intelligent waiver of those rights may be inferred, in circumstances not otherwise casting doubt on voluntary waiver[4], from his proceeding to answer questions without asking for a lawyer. The leading case appears to be *United States* v. *Montos,* 421 F. 2d 215, 223-224 (5th Cir. 1970), cert. den. 397 U. S. 1022 (1970). Other cases applying the rule are *United States* v. *Lamia,* 429 F. 2d 373, 375-377 (2d Cir. 1970), cert. den. 400 U. S. 907 (1970); *United States* v. *Guzman-Guzman,* 488 F. 2d 965, 966-967 (5th Cir. 1974); *United States* v. *Ganter,* 436 F. 2d 364, 369-371 (7th Cir. 1970);

---

[4] Such circumstances are found in *Commonwealth* v. *Murray,* 359 Mass. 541, 543-546 (1971), and in the several cases cited and described in *Commonwealth* v. *Roy,* 2 Mass. App. Ct. 14, 19, and n. 2 (1974). They include the defendant's youth, seriously limited mental ability, or mental illness; undue duration of examination; coercive questioning; delay in permitting access to parents, guardians, or others who might assist the defendant; continuation of questioning after defendant has indicated he wishes to stop answering or to contact a lawyer; or the defendant's being under the influence of drugs or alcohol to such a degree as to impair his free will.

*Hughes* v. *Swenson,* 452 F. 2d 866, 867-868 (8th Cir. 1971);
*United States* v. *Hilliker,* 436 F. 2d 101, 102-103 (9th Cir.
1970), cert. den. 401 U. S. 958 (1971); *United States* v.
*Moreno-Lopez,* 466 F. 2d 1205 (9th Cir. 1972); *United
States* v. *Johnson,* 474 F. 2d 6 (9th Cir. 1973); and *Bond* v.
*United States,* 397 F. 2d 162, 164-165 (10th Cir. 1968),
cert. den. 393 U. S. 1035 (1969). See also *Pettyjohn* v.
*United States,* 419 F. 2d 651, 654-655 (D. C. Cir. 1969),
cert. den. 397 U. S. 1058 (1970), and *United States* v.
*Stuckey,* 441 F. 2d 1104, 1105 (3d Cir. 1971), cert. den. 404
U. S. 841 (1971). The rule has been applied in this Com-
monwealth, most recently in *Commonwealth* v. *Roy,* 2
Mass. App. Ct. 14, 18-20 (1974), which controls on the
facts of the present case.

The knowing and willing quality of the defendant's
waiver and the voluntariness of his statement are not cast
in substantial doubt by his borderline intelligence (which
appears to have been greater than that of the defendants
in *Commonwealth* v. *White,* 362 Mass. 193 [1972], and
*Commonwealth* v. *Daniels,* 366 Mass. 601, 607 [1975]), or
by his suggestion that he felt dizzy, as if he had been
drugged; there was substantial evidence, in the testimony
of the psychiatrist, in the testimony of the police officer
who conducted the interrogation, and in the transcript of
that interrogation, that the defendant had the capacity to
understand and did in fact understand what was transpir-
ing and what was being said to him.

3. The defendant's next contention is that the trial judge
erred in denying his motion, at the close of the Common-
wealth's case, for a directed verdict as to so much of the
indictment as charged murder in the second degree. His
argument is that the Commonwealth's entire case rested on
the defendant's police station statement and that state-
ment makes out at best a case of manslaughter. In the
highly unusual circumstances of this case, a majority of the
panel agree with the defendant's contention, for the follow-
ing reasons.[5]

---

[5] Both parties consider the correctness of the judge's ruling on the
basis of the evidence as it stood at the close of the Commonwealth's

The characteristic distinction between murder and manslaughter is malice. *Commonwealth* v. *Webster,* 5 Cush. 295, 304 (1850). Malice may ordinarily be inferred from the intentional use of a deadly weapon. *Commonwealth* v. *Jones,* 366 Mass. 805, 809 (1975). *Commonwealth* v. *Boyd,* 367 Mass. 169, 184 (1975). *Commonwealth* v. *York,* 9 Met. 93 (1845), established that when the Commonwealth has proved intentional homicide beyond a reasonable doubt, the burden is upon the defendant to show by a preponderance of the evidence that the circumstances in which the killing occurred preclude malice, unless the circumstances of palliation or mitigation appear from the Commonwealth's evidence. See *Commonwealth* v. *Webster, supra,* at 305. Where testimony is adduced which shows such circumstances, the jury may believe the testimony, and return a verdict of manslaughter, or disbelieve the testimony, and return a verdict of murder based on the inference of malice drawn from the intentional homicide. *Commonwealth* v. *Leate,* 352 Mass. 452, 457-458 (1967). *Commonwealth* v. *Rollins,* 354 Mass. 630, 635 (1968). *Commonwealth* v. *Talbert,* 357 Mass. 146, 148 (1970).

An exception to this general principle has been recognized where the only evidence which proves the intentional homicide itself shows it to have been without malice. Perkins, Criminal Law, 50 (2d ed. 1969). Warren, Homicide, § 187, pp. 191, 196-197 (1938). See *People* v. *Mercer,* 210 Cal. App. 2d 153 (1962); *Jones* v. *State,* 212 Ga. 195, 196, 198 (1956); *Thomas* v. *State,* 86 Ga. App. 15 (1952); and *State* v. *Copenbarger,* 52 Idaho 441, 451 (1932). See also *People* v. *Jordan,* 4 Ill. 2d 155 (1954); *State* v. *Whited,* 360 Mo. 956, 960-961 (1950); and *State* v. *Rivers,* 133 Mont. 129, 132-133 (1958). There has come to our attention no prior Massachusetts case which has presented the question whether this limited exception is part of our law. A majority of the panel feel that the exception should be recognized, and that the present case falls within it.

The Commonwealth introduced no evidence from which

case, and all the judges on the panel consider it on that basis also. Cf. *Commonwealth* v. *Ferguson,* 365 Mass. 1, 10 n. 6 (1974).

the jury might have found that the defendant killed Mayes other than the statement the defendant made at the police station. The circumstances of mitigation or palliation were an integral part of the defendant's admission. There was, in the opinion of such majority, no basis (such as inconsistency or implausibility) upon which the jury might justifiably have accepted the portion of the transcribed statement which admitted the stabbing but rejected the portion which described the factual context in which it occurred. The Commonwealth was not bound by the evidence of palliating circumstances it introduced; but as it introduced nothing to contradict that evidence, and nothing other than that evidence to show that the defendant intentionally killed Mayes, it has not proven the existence of malice, but has only proven the absence of malice.

The transcribed statement did not show self-defense, in the legal sense. It did not show that the defendant had no avenue of escape, or that he availed himself of all proper means to avoid physical combat, or that he used no more force than was necessary to defend himself. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211-212 (1966). Rather, it showed a sudden combat in which Mayes was initially the aggressor and in which the defendant's intention to stab Mayes was formed in the heat of the sudden combat. *Commonwealth* v. *Baker*, 346 Mass. 107, 119 (1963). The Commonwealth, in other words, proved a case of voluntary manslaughter. *Commonwealth* v. *Webster*, *supra*, at 305. *Commonwealth* v. *Young*, 326 Mass. 597, 601 (1950). *Commonwealth* v. *Baker*, *supra*. *Commonwealth* v. *Spear*, 2 Mass. App. Ct. 687, 692 (1974). It proved nothing more.

The jury's verdict of guilty of murder in the second degree cannot be sustained as such, but may stand as a verdict of guilty of manslaughter. *Commonwealth* v. *Novicki*, 324 Mass. 461, 467 (1949). *Commonwealth* v. *Eaton*, 2 Mass. App. Ct. 113, 119-120 (1974).

The judgment is vacated, and the defendant is to be resentenced in the Superior Court, as upon a verdict of guilty of manslaughter.

*So ordered.*