COMMONWEALTH vs. ROBERT F. PACHECO.

Plymouth. May 8, 1981. — June 16, 1981.

Present: GREANEY, CUTTER, & KASS, JJ.

Robbery. Evidence, Admissions and confessions, Identification. Identification. Practice, Criminal, Sequestration of witnesses, Sentence. Sex Offender.

At a criminal trial, evidence that the defendant led a blind girl to a secluded area, took her belongings, including her purse, and threw them to the ground, told her he had a knife and threatened to return and kill her, and that the purse was discovered in the secluded area the next day with the loose coins intact but at least three one dollar bills missing warranted a finding beyond a reasonable doubt that the defendant was guilty of armed robbery. [111-112]

The failure of a police officer to advise a defendant that anything he said could be later used against him did not render inadmissible statements subsequently made by the defendant after he had been given proper Miranda warnings at least three more times; nor did the omission from the latter warnings of a statement as to the defendant's right to consult with and seek the advice of an attorney, separate and apart from having an attorney present during any questioning, render the warnings constitutionally deficient. [115-116]

There was ample support in the record of a proceeding on a defendant's motion to suppress a statement for the judge's conclusion that the defendant had voluntarily waived his Miranda rights prior to making the statement. [116-117]

Although the procedure used by the police in obtaining an aural identification of the defendant's voice by a blind victim based on the victim's listening to a single tape recording of a statement made by the defendant was not to be recommended, the aural identification was properly admitted at the defendant's trial where there was evidence that the victim had well developed powers of aural perception, that she had listened to her assailant's voice continuously for a lengthy period of time in circumstances which were likely to fix his voice in her mind, that there were no special elements of unfairness in the playing of the tape, and that the identification was made immediately, without vacillation, and without the victim's hearing the defendant utter any incriminating remarks. [117-120]

There was no merit to a defendant's contention that, because a witness
did not attempt to identify him at trial, evidence of her prior out-of-
court identification was not admissible for substantive purposes.
[120-121]

At a criminal trial, there was sufficient evidence to warrant a finding
that the voice on a tape recording from which a witness had made an
aural identification of her assailant was the defendant's. [121-122]

The judge at a criminal trial did not abuse his discretion in sentencing a
defendant convicted of rape and armed robbery to a penal facility in-
stead of referring him for immediate examination and diagnosis under
G. L. c. 123A, § 4, to determine whether he was a sexually dangerous
person. [122-123]


INDICTMENTS found and returned in the Superior Court
on March 25, 1976.

The cases were tried before *Chmielinski, J.*

*Robert J. Barker, II,* for the defendant.

*Robert M. Payton,* Assistant District Attorney, for the
Commonwealth.

GREANEY, J. The defendant, Pacheco, was convicted on
March 7, 1977, by a jury on indictments charging rape and
armed robbery, and sentenced.[1] He contends on this ap-
peal that the trial judge erred in (1) denying his motion for a
directed verdict of not guilty on the armed robbery charge;
(2) denying his pretrial motions to suppress a statement
made by him after his arrest and the testimony of the iden-
tification of his voice by the victim; (3) denying his request
to call an additional witness at the suppression hearing and
exempting the chief investigating police officer from the se-
questration order in effect during that hearing; and (4) re-
fusing to have him evaluated under G. L. c. 123A, § 4,
prior to sentencing, as a possible sexually dangerous person.
We find no error and affirm the convictions.

---

[1] A sentence of forty-five to fifty years to the Massachusetts Correctional
Institution at Walpole was imposed on the rape indictment, and a from
and after life sentence on the armed robbery indictment. Both of these
sentences were to take effect upon the expiration of a life sentence which
the defendant was then serving. The defendant's convictions on indict-
ments charging assault and battery and kidnapping were filed with his
consent.

Commonwealth v. Pacheco.

1. *The motion for directed verdict.* The evidence perti-
nent to this claim may be summarized as follows. On the
afternoon of March 6, 1976, the victim, a seventeen year old
college student who has been blind from birth, walked from
her home to a drug store in Plymouth to make some pur-
chases. She paid for her purchases with a five dollar bill
and put three one dollar bills in change in her purse. As she
left the store, at about 4:30 P.M., a man offered to assist her
to another store. Instead of taking her to the store, the man
led her to a secluded spot in a wooded park known as the
Jenny Grist Mill pond area which she was able to identify
from the sound of a waterwheel. The man was identified at
trial as the defendant by five witnesses, including one of his
relatives, all of whom saw him on the street with the victim
about 4:30 P.M. and one of whom testified that she saw the
defendant lead the blind girl into the park.[2] The victim
argued with the man as to what was going on. He told her
that he wanted to have sex with her and that he had a knife.
He led her into the woods repeating what he wanted to do
to her sexually. At one point he said he loved her and he at-
tempted to hug her. Eventually, the man threw her to the
ground, took her belongings, including her cane, glasses and
purse, and had forced intercourse with her. When she
resisted, he became violent, choked her and repeatedly hit
her in the face. After that he said he would be back to kill
her. Altogether she was in his presence for more than an
hour. She testified that he talked incessantly during the en-
tire episode. She got up and made her way to a street by
listening to the traffic. There, a passing motorist with
whom she was acquainted stopped and took her to the
police station. She told the police that her assailant wore a
denim coat and had long hair and an unshaven face. From
the police station she was taken to a hospital for treatment.

---

[2] These witnesses testified to out-of-court identifications of the defend-
ant made from photographic arrays shown to them by the Plymouth
police shortly after the incident. These out-of-court identifications were
not challenged as suggestive. The witnesses also made in-court identifica-
tions of the defendant at the trial.

She suffered various injuries, was bleeding and had bruises. There was medical evidence that she had just recently had intercourse. On the following morning a police officer examined the scene and found the victim's cane, glasses and her purse. There were twenty-six cents left in the purse; the currency was missing.

The defendant argues that the foregoing evidence was insufficient to warrant his conviction of armed robbery because the evidence pertaining to the disappearance of the three one dollar bills is equally consistent with a conclusion that they had fallen from the victim's purse during the struggle and had been lost in the woods as with a conclusion that they had been taken in a robbery. He also maintains that if a theft occurred, it happened after the rape. As a consequence, he asserts that the theft was not accompanied by the requisite force when the property was taken and that the resulting crime was larceny, not robbery.

We find no merit to either argument. The above recounted evidence, viewed as it must be in a light most favorable to the Commonwealth (*Commonwealth* v. *Kelley*, 359 Mass. 77, 86 [1971]; *Commonwealth* v. *Clark*, 378 Mass. 392, 404 [1979]; *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 [1979]), would have permitted a rational jury to conclude that the defendant had a continuing intent to rob as well as rape the victim and that he accomplished both purposes. The fact that the victim's purse, containing at least three one dollar bills, was removed from her possession by force, backed by the defendant's statement that he had a knife, his subsequent threat to return and kill her, and the discovery at the scene on the following morning of the purse with the currency missing but with the loose coins intact, established a sufficient basis for a jury verdict convicting the defendant of armed robbery. *Commonwealth* v. *McCarthy*, 360 Mass. 566, 567-568 (1971). *Commonwealth* v. *Jones*, 362 Mass. 83, 90 (1972). Cf. *Commonwealth* v. *Montmeny*, 360 Mass. 526, 530 (1971). Contrast *Commonwealth* v. *Novicki*, 324 Mass. 461, 464 (1949).

2. *The motions to suppress.* The defendant was arrested by the Taunton police on a warrant about 6:15 P.M. on March 8, 1976. At the Taunton police station, he was advised of his Miranda rights[3] and informed of his right to make a telephone call pursuant to G. L. c. 276, § 33A. The Plymouth police were notified that he was in custody and were advised to pick him up. While at the Taunton police station, the defendant made a telephone call. Shortly after the call was completed, his father appeared at the station and spoke with him. The defendant was not questioned, nor did he volunteer any statements while he was held at the Taunton station.

About 7:00 P.M., Sergeant Murphy of the Plymouth police arrived in Taunton, took custody of the defendant, and, prior to transporting him to Plymouth, advised him of his Miranda rights. Upon arriving at the Plymouth police station, Murphy again advised the defendant of his Miranda rights.[4] He was then booked by Sergeant Budge who warned him a further time of his Miranda rights,[5] and readvised him of his right to make a telephone call to speak to friends, arrange for bail or consult a lawyer. Murphy testified that at the completion of the booking procedure, the defendant signed a slip indicating that he had "understood"

---

[3] A Taunton police detective testified that he advised the defendant at the time of arrest that he had a right to remain silent, that he did not have to answer any questions unless a lawyer was present, that he could refuse to answer questions, and that if he could not afford a lawyer one would be provided for him.

[4] Murphy testified that this advice consisted of warnings that the defendant had the right to remain silent, that if he agreed to answer any questions anything he said could be used as evidence against him in a court of law, that he had a right to have an attorney present during any and all questioning, that if he agreed to answer questions he could stop the interrogation at anytime, and that in the event he could not afford an attorney and desired counsel, a lawyer would be provided for him without charge before he was asked anything.

[5] The rights given by Sergeant Budge were described as the same as those given a short time before by Sergeant Murphy.

the Miranda warnings.[6]  Later that evening, the defendant gave Murphy a tape recorded statement.[7]

On March 8, 1976, Sergeant Murphy interviewed the victim at her home.  After discussing the incident with her for about twenty minutes, he told her that he was going to play a tape recording and advised her not to say anything until the machine had been shut off.  Nothing else was said prior to the tape being played.  Upon hearing a brief portion of the cassette, the victim identified the defendant's voice as that of her assailant.[8]  There was evidence that the victim had, because of her blindness, developed an ability to identify the voices of different persons, and that she could accurately identify the voices of each of thirty or forty college acquaintances promptly after they would greet her.

The judge concluded in his written memorandum that "the defendant was fully advised of his rights as required under Miranda . . . , that it [was] proven beyond a reasonable doubt that he understood them and that he exercised a knowing, intelligent and voluntary waiver of his . . . rights when he spoke with Sergeant Murphy on . . . March 8, 1976."  He also found that the statutory requirements of G. L. c. 276, § 33A, with respect to a telephone call had been met.  As to the voice identification, the judge found that the victim's "means of identification by voice was developed to the similar extent that a sighted person is able

---

[6] The portion of the slip which contained the defendant's signature was not introduced in evidence, nor were the contents of that slip explained.

[7] The contents of this statement were not introduced at the voir dire on the suppression motions but its substance was introduced at trial.  In his statement the defendant admitted that on the day of the incident he had helped the victim to cross the street, because she was blind, that he left her in the vicinity of the food store she wanted to shop at, that he was wearing dungarees and a blue denim jacket, and that although he had shaved that day he had not shaved for about three weeks before.

[8] The identification procedure was conducted with the use of two tape recorders.  While the tape containing the defendant's voice was played a separate tape recorder was run to transcribe the conversations between the victim and Sergeant Murphy and the material from the defendant's statement.

to make a visual identification." He concluded that while the voice identification procedure used by the police is "not to be recommended," it was not so suggestive as to require the identification's suppression. In reaching this conclusion, he relied primarily on the evidence of the victim's aural acuity, together with the facts that she had been in her assailant's presence for a considerable period of time, in circumstances that would tend to fix the defendant's voice in her mind, and that she had made an almost immediate identification of the defendant's voice on the tape recording without any prompting by Sergeant Murphy.

A. *The statement.* The defendant contends that he was not properly advised of his Miranda rights because the warnings furnished in Taunton failed to indicate that anything he said could be later used against him, and because the warnings provided by the Plymouth police failed to make it clear that he had the right to consult with and seek the advice of an attorney, separate and apart from having an attorney present during any questioning. Based on these perceived deficiencies, and the fact that the record does not contain a formal waiver, the defendant claims that the Commonwealth failed to establish that he had intelligently and voluntarily relinquished his rights.

The warnings given in Taunton were deficient, but the shortcomings are of no consequence because no questioning was undertaken, nor statement given, while the defendant was being held there for the Plymouth police. The at least thrice repeated warnings furnished by the Plymouth police complied in all essential respects with the command of Miranda that a suspect "be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda* v. *Arizona*, 384 U.S. 436, 479 (1966). The rights recited by the Plymouth police are virtually identical to the rights given by the officers and approved by the Supreme Judicial Court, in *Com-*

monwealth v. *Lewis*, 374 Mass. 203, 204, 205 (1978). Moreover, the police complied with the "better practice" of furnishing the defendant with the so called optional "fifth warning" that he could stop any questioning at any time if he so desired. See also *Commonwealth* v. *Williams*, 364 Mass. 145, 148 n.1 (1973); *Commonwealth* v. *Fielding*, 371 Mass. 97, 115 (1976). Undoubtedly, in most cases, the police will supplement the warnings by instructing the suspect of his right to consult with counsel prior to, and during the course of, any questioning. See *Commonwealth* v. *Johnson*, 3 Mass. App. Ct. 226, 229 n.3 (1975), and cases cited. But the omission of that piece of advice will not render an otherwise clear and comprehensible statement of "the four required Miranda warnings" (374 Mass. at 205) constitutionally defective. The defendant's argument to the contrary confuses what must be said under Miranda to meet fundamental constitutional requirements, with what the police should do if a suspect chooses to exercise any of his rights. See 384 U.S. at 469-470. We hold that the Miranda requirements were fully satisfied in this case.

There is also ample support for the judge's conclusion that the defendant voluntarily waived his rights prior to making the statement.[9] "[I]f the record demonstrates that a defendant has been clearly and accurately told of the Miranda rights and that he has affirmatively acknowledged his understanding of those rights, a knowing and intelligent waiver of those rights may be inferred, in circumstances not otherwise casting doubt on voluntary waiver." *Commonwealth* v. *Johnson, supra* at 230, and cases cited. *Commonwealth* v. *Roy*, 2 Mass. App. Ct. 14, 19-20 (1974). *Com-*

---

[9] This conclusion could have been established more easily if the tape recording or a stipulated transcript thereof had been introduced at the voir dire, because prior to taking the statement the officer fully repeated all of the Miranda warnings. This portion of the statement was not introduced, however, at this hearing or at the trial. Although the judge appended a copy of a transcript of the tape recording to his memorandum of decision on the suppression motions, there is no indication that he relied upon it in deciding the waiver issue.

*monwealth* v. *White,* 9 Mass. App. Ct. 839, 840 (1980). *Commonwealth* v. *Collins,* 9 Mass. App. Ct. 915, 916 (1980). Explicit statements that the defendant understood his rights and waived them are not essential. *Commonwealth* v. *Valliere,* 366 Mass. 479, 487 (1974). *Commonwealth* v. *Williams,* 378 Mass. 217, 226 n.7 (1979). *Commonwealth* v. *Monteririo,* 4 Mass. App. Ct. 349, 351 (1976). See *North Carolina* v. *Butler,* 441 U.S. 369, 373 (1979).

In addition to the oft-repeated Miranda warnings (see *Procunier* v. *Atchley,* 400 U.S. 446, 453 [1971]), the evidence indicates that the defendant was fairly and courteously treated while in custody and during the taking of the statement. There is no evidence that the police engaged in any threats, trickery or deception, nor any evidence that the defendant suffered any disability or impairment of physical or mental functions. It is conceded that the defendant is of average intelligence and there is no suggestion that he was not alert at the time of the questioning. The questioning was not unduly lengthy or prolonged. Cf. *Watts* v. *Indiana,* 338 U.S. 49, 53 (1949); *Clewis* v. *Texas,* 386 U.S. 707, 709 (1967). Like the trial judge, we cannot find anything in the record which would show that the statement was involuntary.

B. *The voice identification.* The defendant maintains that the voice identification procedure amounted to an impermissibly suggestive one-on-one confrontation which violated his right to due process. The scope of due process protection against the admission of evidence derived from pretrial identification procedures is, by now, firmly established constitutional doctrine. Such evidence is not admissible where "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967). *Commonwealth* v. *Venios,* 378 Mass. 24, 26-27 (1979). In deciding this threshold question, it is necessary to examine the "totality of the circumstances" surrounding

the identification alleged to be impermissibly suggestive. *Stovall* v. *Denno, supra* at 302. Although this test was enunciated with regard to visual identifications produced by photographic displays and lineups, it is equally applicable to a voice identification. *Commonwealth* v. *Torres,* 367 Mass. 737, 740 (1975), and cases cited. The use of a single taped voice raises suspicion of a constitutional violation, but that factor alone will not constitute sufficient ground for exclusion of the out-of-court identification. *Id.* See *Commonwealth* v. *Nolin,* 373 Mass. 45, 51 (1977); *Commonwealth* v. *Venios, supra* at 29; *Nassar* v. *Vinzant,* 519 F.2d 798, 801 (1st Cir.), cert. denied, 423 U.S. 898 (1975). Rather, "[t]he crucial determination . . . is whether the identification sought to be admitted in evidence is the product of the witness' observations at the time of the crime or is instead the product of improper suggestions by the police." *Commonwealth* v. *Wheeler,* 3 Mass. App. Ct. 387, 392 (1975).

We agree with the trial judge that the procedure used here is not one to be recommended as a substitute for obtaining such identifications by an impartially constructed array of voices.[10] Nevertheless, we are not prepared to say, after careful scrutiny of all the circumstances pertaining to this identification, including its one-on-one feature, that constitutional standards were violated. The judge's findings, which are amply supported by the underlying evidence, indicate that the victim had developed extraordinary powers of aural perception, and that she listened to her assailant's voice continuously for a lengthy period of time in circumstances which made her attention inevitably intense

[10] As stated in *Commonwealth* v. *Marini,* 375 Mass. 510, 517 (1978): "At all events, police and prosecutors are warned to take particular pains to avoid suggestive conditions in making arrangements for *out-of-court* tests where a witness tries to match live voices with his recollections of a voice heard in the usually stressful original setting. One-on-one auditions ought certainly to be avoided . . .; there should be the best approach to a 'lineup' with precautions against directing undue attention to any participant." *Marini* also suggests other safeguards and protocol to minimize the risk of suggestiveness on voice identifications.

and which were likely to fix his voice in her mind. The playing of the tape was not corrupted by any "special elements of unfairness." See *Russell* v. *United States,* 408 F.2d 1280, 1284 (D.C. Cir.), cert. denied, 395 U.S. 928 (1969); *Commonwealth* v. *Barnett,* 371 Mass. 87, 93 (1976). For example, she was not told that the defendant was in custody. Indeed, the judge found, on the evidence he determined to be more credible, that the police sergeant gave the victim no prompting before or during the playing of the tape (contrast *Palmer* v. *Peyton,* 359 F.2d 199, 201 [4th Cir. 1966]; *Commonwealth* v. *Moon,* 380 Mass. 751, 758 [1980]) and the record does not indicate that he otherwise engaged in behavior which might have prejudiced the identification. Contrast *Sanchell* v. *Parratt,* 530 F.2d 286, 297 (8th Cir. 1976). Moreover, the identification was made (as found by the judge) "almost immediately" after the tape was started. There is no claim that the victim vacillated and arrived at the identification only after the defendant had uttered incriminating remarks.[11] Importantly, the identification was found by the judge, on competent evidence, to be based "solely upon" the victim's independent memory of her assailant's voice as recalled from the impressions made by that voice at the scene of the crimes. Thus it bears sufficient indicia of trustworthiness to satisfy either the reliability test formulated in the *Biggers-Brathwaite* cases or the independent source standard stated in the *Botelho-Venios* decisions.[12] The constitutional protections

---

[11] The portions of the tape heard by the victim at the voice identification procedure were in large part transcribed by the court reporter as "inaudible." The victim appears to have made her identification based on a few fragments of the tape which stated (as far as we have them) "I walked down through . . . on the left hand side a . . . it goes . . . ." The defendant states in his brief that the victim heard only a "minor portion" of the defendant's voice. There is no claim that any of the statements upon which the identification was made were inculpatory in nature.

[12] The references here are to the familiar decisions in *Neil* v. *Biggers,* 409 U.S. 188 (1972); *Manson* v. *Brathwaite,* 432 U.S. 98 (1977); *Commonwealth* v. *Botelho,* 369 Mass. 860 (1976); and *Commonwealth* v. *Venios, supra.* We recognize, of course, that the reliability and inde-

in this area are designed, among other things, to preserve
the integrity of the truth seeking process by eliminating, to
the extent reasonably possible, convictions based on highly
suspect identifications. See *Neil* v. *Biggers*, 409 U.S. at 198;
*Foster* v. *California*, 394 U.S. 440 (1969); *Caver* v.
*Alabama*, 537 F. 2d 1333, 1335 (5th Cir. 1976). Such a
risk, in the constitutional sense, was not present here
because the victim had not been "manipulated so that the
mental image derived from the identification procedure
supplant[ed] that derived from [her] own experience."
*United States* v. *Pheaster*, 544 F. 2d 353, 370-371 (9th Cir.
1976), cert. denied, 429 U.S. 1099 (1977). Thus, we con-
clude that due process standards were met, and that any in-
firmities in the challenged identification were properly left
for the defense to raise at trial and for the jury to weigh in
deliberations. See *Commonwealth* v. *Cincotta*, 379 Mass.
391, 396-397 (1979), and cases cited.

    3. *Use of the identification at trial.* We find unavailing
the defendant's contention that, because the victim did not
attempt to identify the defendant at trial, evidence of her
prior out-of-court identification was not admissible for sub-
stantive purposes. A constitutionally proper out-of-court
identification is admissible for substantive purposes even if
the victim is unable or unwilling to identify the defendant
at trial (*Commonwealth* v. *Swenson*, 368 Mass. 268, 272
n.3 [1975]; *Commonwealth* v. *Fitzgerald*, 376 Mass. 402,
408-409 [1978]; *Commonwealth* v. *Vitello*, 376 Mass. 426,

---

pendent source formulations are usually applied in the context of the ad-
missibility of a proposed in-court identification after an out-of-court iden-
tification has been suppressed as unnecessarily suggestive. The victim did
not make an in-court identification in this case. The judge made alter-
native findings under both of the foregoing tests in the event that we
should find the voice identification procedure to be impermissibly sug-
gestive. We think that this was a proper mode of analysis in the peculiar
circumstances of this case, because a study of the totality of events
necessarily implicates, and is intrinsically connected with, this victim's
perceptions of her assailant at the time of the commission of the crimes
and her ability to retrieve and apply those impressions. In so deciding,
we have given weight to the testimony of the victim's description (see
*supra* at 111-112 & 114 n.7.

458-459 [1978]), and even if no attempt to obtain an identification at trial is made. *Commonwealth* v. *Torres, supra* at 738-739. See also Rule 801 (d)(1)(c) of the Proposed Massachusetts Rules of Evidence. The defendant's attempt to distinguish *Torres* on the ground that it involved an out-of-court identification of an actual voice and not a tape-recorded voice is without merit. We see nothing to the contrary in *Commonwealth* v. *Repoza*, 382 Mass. 119 (1980).

The defendant also argues that there was no testimony before the jury which established that the voice on the tape played by the sergeant to the victim was that of the defendant. The relevant testimony was as follows. The victim was asked on direct examination if she heard a tape when visited at her home by the police sergeant and if she identified the voices on it. She said that she identified "Sergeant Murphy's and the defendant's" voices. Upon objection of defense counsel, the prosecutor said "[D]o you mean the man who assaulted you?," and she said, "Yes." The only other evidence with respect to the tape and the voice identification came from Murphy's testimony that he had advised the defendant that a tape was being made of a conversation (between him and the defendant), and that this tape might be used in an identification of his voice.

From this evidence, we think that the jury could have inferred that the voice on the tape was that of the defendant. However, even if the evidence of the voice identification was arguably incompetent, there would be no error where the defendant's counsel did not move to have the victim's statements struck after it became apparent that sufficient testimony identifying the voice on the tape with that of the defendant was not forthcoming.[13] See *Commonwealth* v.

---

[13] While the judge did not state explicitly that the victim's testimony was being admitted conditioned on subsequent testimony concerning the tape, such could be implied from the colloquy between him and defense counsel. The judge was not obliged to advise defense counsel that it was his burden to move to have the testimony struck in the event the subse-

*Dyer*, 243 Mass. 472, 507 (1922), cert. denied, 262 U.S. 751 (1923); *Commonwealth* v. *Knight*, 257 Mass. 421, 424-425 (1926); *Commonwealth* v. *Demboski*, 283 Mass. 315, 320 (1933).

4. *Other issues.* The remaining claims do not require extended discussion.

(a) Although it would have been preferable to have permitted defense counsel to call Sergeant Budge from Plymouth as his last witness at the suppression hearing, the judge's failure to do so does not constitute reversible error in view of evidence which warranted a conclusion that the defendant's telephone rights had been satisfied by the Taunton police.

(b) No abuse of discretion can be found in the judge's exemption of Sergeant Murphy from the sequestration order. The judge implicitly found him to be "essential to the management of the case." *Commonwealth* v. *Therrien*, 359 Mass. 500, 508 (1971). *Commonwealth* v. *Washburn*, 5 Mass. App. Ct. 195, 197 (1977).

(c) The judge acted within his discretion in sentencing the defendant to a penal facility instead of referring him, as requested by defense counsel, for immediate examination and diagnosis by psychiatrists under G. L. c. 123A, § 4, in order to determine whether he was a sexually dangerous person. See *Thibodeau* v. *Commonwealth*, 366 Mass. 452, 455-456 (1974). Although the defendant was convicted of a sexual crime involving the use of force, and although his background disclosed a history of sexual offenses, the judge could properly have decided that continued imprisonment was the more appropriate disposition, leaving the question of an examination under § 4 to be resolved, as the judge stated "administratively." See *Id.* at 457. Once he was sentenced further proceedings would be under G. L. c. 123A,

quent testimony was not introduced. See Annot., 88 A.L.R. 2d 12, 79, § 10 (1963). It is of special note that defense counsel made effective use of the scantiness of the evidence concerning the voice identification in his closing argument, a fact which suggests that he was content as a matter of purposeful trial strategy to leave that point to the jury's consideration.

§ 6. This is particularly so where the defendant was already serving a life sentence. The existence of the statutory option of treatment "does not imply . . . that traditional sentencing concerns and alternatives have been preempted by the remedial concerns of this statute. A sentencing judge may consider other factors, such as punishment and deterrence, despite the existence of the sexually dangerous offender provisions." *Thibodeau* v. *Massachusetts*, 428 F. Supp. 542, 545 (D. Mass. 1977).

*Judgments affirmed.*