# United States Court of Appeals
## For the First Circuit

No. 13-1046

UNITED STATES OF AMERICA,

Appellee,

v.

GUSTAVO CASTRO-CAICEDO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Barron, Circuit Judges.

Chauncey B. Wood, with whom Wood & Nathanson, LLP was on brief, for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

James L. Brochin, Jennifer H. Wu, Marques S. Tracy, Laura E. Sedlak, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Barry C. Scheck, Karen A. Newirth, Innocence Project, Inc., on brief for Innocence Project, Inc., amicus curiae in support of appellant.

December 24, 2014

BARRON, **Circuit Judge**.  Gustavo Castro-Caicedo appeals his conviction and sentence for participating in a conspiracy that sought to send cocaine from Colombia to the United States.  His primary objection is that federal agents used a highly suggestive means to prompt a member of the conspiracy to identify him as a confederate, and thus that the government's use of the identification at trial violated his constitutional right to due process.  Castro-Caicedo also challenges the admission of other testimony under the Federal Rules of Evidence.  And, finally, he argues that his sentence was unreasonably lengthy.  But although the record shows the District Court was justified in finding that the means used to obtain the identification were problematic, we find the record also supports the District Court's well-considered judgment that there was reason enough to credit the identification to permit a jury to decide its worth.  Because we see no merit in Castro-Caicedo's remaining challenges -- each of which he raises for the first time on appeal -- we affirm both the conviction and the sentence.

## I.

Following an investigation by a Drug Enforcement Administration (DEA) task force and cooperating elements of Colombian law enforcement agencies, Castro-Caicedo, a Colombian national, was indicted in Massachusetts on one count of participating in a conspiracy to import cocaine to the United

States, or to manufacture and distribute cocaine for importation to the United States. 21 U.S.C. §§ 952(a), 959(a), 960(b)(1)(B). At trial, the conspiracy's leader testified that the conspiracy involved, in part, transporting tens of kilograms of cocaine from Cali, a city in Colombia, to the Colombian port city of Buenaventura, from where it would be sent by ship to the Bahamas. The government also put forth evidence to show Castro-Caicedo helped organize some of those shipments out of Buenaventura from at least 2007 to 2009.

To prove the further allegation that the conspiracy sought to ensure the cocaine would reach this country, the government presented a variety of evidence, both direct and circumstantial. Castro-Caicedo's challenge to his conviction takes aim at only certain portions of this evidence, and we tailor our recitation of the facts accordingly.

Castro-Caicedo's lead challenge is to one piece of direct evidence: the testimony of an informant we will call "J.D."[1] J.D. used to be a seaman on a container ship based out of Freeport, Bahamas that often called at Buenaventura, Colombia. Federal agents first spoke with J.D. about his participation in a cocaine smuggling operation in 2009. In 2012, a little more than a month before

---

[1] We assign these initials to identify the informant "in light of concerns about the safety of cooperating witnesses raised by the Committee on Court Administration and Case Management of the Judicial Conference of the United States." United States v. Etienne, ___ F.3d ___, 2014 WL 5462541, at *1 n.1 (1st Cir. 2014).

-3-

trial, J.D. first told the agents that more than four years before he met twice with a person known to him then only as the owner of a home in the city of Buenaventura. J.D. told the agents that, through those two meetings, he and the owner of that house reached an agreement to ship certain quantities of cocaine to the United States.

Federal agents then showed J.D. eleven photographs, three of which depicted other members of the conspiracy and the last of which was an image of Castro-Caicedo. Upon seeing that picture, J.D. identified it as depicting the owner of the house and thus the person with whom he had struck the deal.

Castro-Caicedo moved to suppress the identification prior to trial. He argued the presentation of the photographs impermissibly cued J.D. to pick out Castro-Caicedo's picture. And he further argued that, by then, too much time had passed since J.D.'s last encounter with the person he purported to identify for the identification to be reliable enough to overcome the taint of that impermissibly suggestive display of photographs. He thus argued the use of the identification at trial would violate his constitutional right to due process.

The District Court disagreed. It found the photographs had been assembled in a manner that was unduly suggestive. But the District Court also found the identification was still reliable enough to put to the jury.

-4-

Castro-Caicedo did not raise his other evidentiary challenges at trial. He thus presses them for the first time on appeal.

The first of these unpreserved objections concerns testimony about two large seizures of cocaine shipments in Colombia in 2008, one of 875 kilograms of cocaine and the other of 500 kilograms. The government introduced the testimony to support its contention there was a cocaine conspiracy to join, that coded conversations between conspirators (including Castro-Caicedo) referred to cocaine trafficking, and that the conspiracy was of such scope that it must have aimed to send cocaine to the United States.

Castro-Caicedo contends he had no direct tie to either shipment, and the government concedes the point. Castro-Caicedo thus argues that, under the Federal Rules of Evidence, the testimony was either irrelevant or unduly prejudicial and that his conviction should be reversed in consequence.

Castro-Caicedo's other unpreserved evidentiary objection concerns a Colombian police officer's testimony about a polygraph test he took upon joining the DEA task force. In addition to testifying about a recorded call mentioning the 500-kilogram seizure discussed above, this officer also testified about a number of other recorded calls involving Castro-Caicedo and others who pled guilty to involvement in the conspiracy. Castro-Caicedo contends the officer's testimony about the polygraph led jurors to give undue

weight to his credibility.  Castro-Caicedo thus argues the admission of this polygraph testimony violated the Federal Rules of Evidence and requires reversal of the conviction.

Finally, Castro-Caicedo challenges his sentence.  Here, too, he presses an argument he makes for the first time to us. Castro-Caicedo contends the 300-month prison  sentence he received is unreasonable.  He argues the District Court unjustifiably varied upward from the sentence suggested by the Sentencing Guidelines and, in doing so, imposed a sentence that far surpasses the length of the sentences given to other members of the conspiracy, including its purported leader.

We use this same order of presentation to address the merits of each challenge.

## II.

J.D.'s identification purported to offer direct evidence that Castro-Caicedo participated in the cocaine conspiracy and that the conspiracy intended to send cocaine to the United States -- evidence, in other words, that directly supported the conspiracy charge set forth in the indictment.  Typically, juries weigh the reliability of evidence, including eyewitness identifications. But when the government uses highly suggestive means to elicit an eyewitness identification, there may be reason to depart from that norm.

In such a case, there is a real concern the identification will be mistaken, or at least will result from the suggestive means the government used to prompt the witness rather than from the witness's memory of having encountered the person identified. And the Supreme Court has made clear that very concern may arise if "the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." Simmons v. United States, 390 U.S. 377, 383 (1968).

Because, in such circumstance, the government's own choice to use a suggestive prompt casts doubt on the identification's reliability, the Constitution may bar the government from benefitting from the problematic means used to elicit that information. Perry v. New Hampshire, 132 S. Ct. 716, 726 (2012). Thus, upon a defendant's showing the government used unduly suggestive means to obtain an eyewitness identification, the government must show why the identification should be put to the jury despite its tainted origins. Neil v. Biggers, 409 U.S. 188, 199 (1972); United States v. Jones, 689 F.3d 12, 17 (1st Cir. 2012).

In assessing a district court's ruling on such questions, we review the findings of fact for clear error and the conclusions of law de novo, allowing for some "reasonable latitude for case-specific decisions" applying law to fact. Jones, 689 F.3d at

18. Applying that standard, we conclude the District Court did not err in finding that, although the government presented the photographs in an unduly suggestive way, the government had met its burden of showing the jury should still be allowed to consider J.D.'s identification.

## A.

We start with what the record shows about what led the federal agents to show J.D. the photographs in the first place. In April of 2009, federal agents convinced J.D. to become a confidential informant. In that role, J.D. told the agents about cocaine shipments from Colombia to the Bahamas.

An agent testified that J.D. did not at that time specifically mention having met with an owner of a house in Buenaventura, that such a person was involved in those cocaine shipments, or that this person reached an agreement with J.D. to send cocaine to the United States. But during a follow-up meeting with a federal prosecutor and investigator in August 2012, the agents testified, J.D. did for the first time specifically mention meeting such a person, that person's involvement with the shipments, and the deal they reached.

And while J.D. did not at that time provide the name of this person, he did offer a description of him. Testimony showed J.D. described him as being between five feet eight inches and five feet ten inches tall, about fifty years old, and having a dark

complexion, a "sagging . . . belly," a limp, and limited English facility.

The prosecutor and investigator then, impromptu, showed J.D. a number of photographs on the prosecutor's laptop. J.D. testified he initially told the prosecutor and investigator he would not be able to identify the person with whom he had met. The investigator, by contrast, testified J.D. said he might be able to recognize some individuals from the conspiracy.

The investigator prefaced the presentation of the photographs by telling J.D. he might not recognize anyone in the photographs, he need not identify any specific photograph or person, and he should identify someone appearing in one of the photographs only if he was certain he knew who was depicted. J.D. saw each photograph sequentially, and he did not know at the outset how many he would see by the end.

The prosecutor and investigator ultimately showed J.D. eleven photographs. The set included a picture of Castro-Caicedo at the end, preceded by ten photos of other men, including three members of the conspiracy.

The District Court found this presentation concerning, explaining that it was not "of a conventional sort" and that "[i]t wasn't assembled to meet the standards of a typical photo array." The District Court found especially troubling that there were "not a number of people of Mr. Castro-Caicedo's age or appearance" and

that "4 of the 11 are people who have been charged in this case and three of whom have pled guilty." And it ruled, in the end, that the display was "impermissibly suggestive."

Whether or not the inclusion of the conspirators was itself problematic, cf. United States v. Hilario-Hilario, 529 F.3d 65, 71 (1st Cir. 2008) (assuming but not deciding that a photo lineup that grouped conspirators together was unduly suggestive), the record supports the District Court's conclusion that there were not "a number of people of Mr. Castro-Caicedo's age or appearance." The photograph of Castro-Caicedo appears to depict a person far older and with darker skin than any other person in the set. He is also the only person in the set whose sagging belly is shown. Moreover, Castro-Caicedo is depicted in a striking yellow and blue striped shirt while the others wore more muted garb.

The assembly of photographs thus raises the concern that its design cued J.D. to pick out that photograph in particular. See United States v. DeCologero, 530 F.3d 36, 62 (1st Cir. 2008) (noting that undue suggestion depends on "whether the photo array included, as far as was practicable, a reasonable number of persons similar in appearance to the suspect"); United States v. Lau, 828 F.2d 871, 876 (1st Cir. 1987) (characterizing Simmons, 390 U.S. at 383-84, as holding that "police should avoid emphasizing picture of suspect in photographic identification"). And thus the District Court was justified in finding the photographs had been shown to J.D. in a

-10-

manner so suggestive it gave rise to the risk of an unreliable identification. See Simmons, 390 U.S. at 383 (The danger of an incorrect identification "will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.").

**B.**

Nonetheless, the District Court went on to rule the identification was sufficiently reliable to permit a jury to consider it. And because the record supports that judgment, too, we decline to disturb it.

The District Court reached this conclusion after considering the five factors that much precedent makes relevant to an overall determination about the reliability of an identification that has been prompted by unduly suggestive means. Those factors are:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

As to the first factor, the record supports the District Court's finding that J.D. "had a good opportunity to view" Castro-

-11-

Caicedo over "about" an hour and a half in direct conversation in close quarters. J.D. testified his container ship twice docked in Buenaventura in late 2007 and early 2008. He further testified he met each time with the man he purported to identify in close proximity in the man's house, for "[p]robably less than an hour" in the first meeting and "less than thirty minutes" in the second. That is a total period of time we have previously described as providing "ample time to view the defendant," United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995), and a period exceeding the half hour Biggers thought a "considerable period of time," 409 U.S. at 200.

J.D.'s testimony also supports the District Court's conclusion on the second factor: J.D. was "paying careful attention" to Castro-Caicedo during these meetings. Not only did J.D. testify to that very fact, but his testimony about the context of those meetings supports it: J.D. testified he was meeting with coconspirators to forge a deal about a drug shipment. See United States v. Drougas, 748 F.2d 8, 27-28 (1st Cir. 1984) (concluding that cooperating witness in drug smuggling operation had incentive and opportunity to pay close attention to coconspirator who was also a state trooper).

Castro-Caicedo speculates J.D. may have been drunk during the first meeting because J.D. testified the owner offered him a beer. But J.D. never testified he took the offer or consumed any

alcohol. Indeed, J.D. testified he countered by asking for coffee. Nothing in the record thus would compel an inference J.D. was intoxicated and could not have paid the close attention the District Court found. Castro-Caicedo also asserts J.D. was distracted during the second meeting because J.D. testified he was using the internet at the outset of the meeting while others fetched cocaine. But the District Court found J.D. was paying close attention during both meetings, and the fact that J.D. used the internet before his discussions with the owner in the second meeting does not render that finding clearly erroneous.

The District Court found that the third factor favored the use of the identification, as J.D.'s prior description was "quite consistent" with Castro-Caicedo's actual characteristics. That prior description was not so precise or unusual to make it proper for the government to present photographs containing only one matching it. Compare DeCologero, 530 F.3d at 62 ("[The defendant] has no unusual features that might complicate the search for others with similar appearances, yet the other photos in the array were not of men who looked similar to [him] . . . ."), with United States v. Holliday, 457 F.3d 121, 126 (1st Cir. 2006) ("[T]he defendant's appearance was so unusual that '[i]t would be unreasonable to expect the police to find pictures of eight other men who not only shared his age, weight, hairstyle, and ethnicity, but in addition had a similar pattern of facial discoloration.'" (alteration in

-13-

original)).  And the correlation between a witness's prior description and the accuracy of that witness's later identification may be weaker than commonly thought and might sometimes be negative. See Massachusetts Supreme Judicial Court Study Group on Eyewitness Evidence, Report and Recommendation to the Justices 65 (2013).  But given the high degree of attention and substantial opportunity to observe that the District Court found the witness had here, the "case-specific" judgment the District Court made on this factor merits "reasonable latitude," Jones, 689 F.3d at 18, and is not clearly wrong.

The record does not clearly support the District Court's finding that the fourth factor -- the eyewitness's certainty -- also favored the use of the identification.  For while the District Court found J.D. was "quickly certain" in identifying Castro-Caicedo, the record supports the judgment J.D. was quick to make the identification, but not necessarily that he expressed any view as to his level of certainty.  But the lack of clarity on that point matters little.  J.D.'s certainty is at best a neutral factor, and here there is no indication of J.D.'s lack of certainty.  See Jones, 689 F.3d at 18 ("[T]he witness' lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor.").

And finally, the record comports with the District Court's finding about the relatively limited import in this

-14-

particular case of the fifth factor, concerning the lapse of time prior to the identification. That lapse was lengthy -- four and a half years. But while we have said "a five-year gap between the crime and the photographic identification is very much greater than would ordinarily be permissible to find an . . . identification reliable," Drougas, 748 F.2d at 28; see also Biggers, 409 U.S. at 201 ("[A] lapse of seven months between the rape and the confrontation . . . would be a seriously negative factor in most cases."), we have permitted an identification to go before the jury where the identification came "nearly seven years" after the witness observation when "the other reliability criteria were sufficiently persuasive," Flores-Rivera, 56 F.3d at 331. In particular, we have upheld a district court's denial of a motion to suppress where the witness had "between one and two hours" to observe the suspect and had special reason to pay close attention. Id. at 330-31; see also Drougas, 748 F.2d at 28 (holding that a five-year gap was outweighed by a coconspirator identification that was based on "considerable" opportunity to observe). We find no reason to reach a different result here, given the District Court's findings, supported by the record, regarding the circumstances of the substantial contacts between J.D. and the person he later identified as Castro-Caicedo.

On appeal, Castro-Caicedo does raise for the first time an additional set of arguments for why we should doubt the identification -- namely, that recent social science research

reveals the perils of crediting an eyewitness's memory. The Innocence Project, as amicus, agrees.

But Castro-Caicedo did not raise these arguments below. If he had, the District Court could have weighed them in deciding Castro-Caicedo's motion to suppress -- assuming the District Court did not implicitly do so on its own. Castro-Caicedo also could have presented the same arguments to the jury or asked for jury instructions noting those possible concerns with eyewitness identifications. See Jones, 689 F.3d at 20 (permitting jury instructions). But Castro-Caicedo took advantage of none of these opportunities to make his case. And the general survey of social science research he now presents for the first time on appeal offers us no reason to reject the specific and detailed findings made below about the distinguishing features, and hence reliability, of this particular identification.

### III.

Castro-Caicedo also complains the District Court admitted testimony regarding two seizures of cocaine to which he had no direct tie -- and the government concedes there was no such direct link. Castro-Caicedo thus argues the testimony was irrelevant or substantially more prejudicial than probative and should not have been admitted. Fed. R. Evid. 401, 402, 403.

But even when evidentiary challenges of this sort are preserved, we are disinclined to find a District Court has abused

its discretion in assessing the relevance or unduly prejudicial nature of testimony. United States v. Lyons, 740 F.3d 702, 718 (1st Cir. 2014). We are even less willing to do so when, as here, the defendant failed to object below, and we may then reverse only if the error is plain. United States v. Burdulis, 753 F.3d 255, 263 (1st Cir. 2014) (We "requir[e] the appellant to show that the error, if any, was 'clear or obvious,' 'affected his substantial rights,' and 'seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" (quoting United States v. Mardirosian, 602 F.3d 1, 11 (1st Cir. 2010))).

Here, the challenged testimony about one of the seizures -- consisting of 875 kilograms of cocaine, of which the leader of the conspiracy allegedly owned 60 kilograms -- furthered the government's contention that there was a conspiracy to ship cocaine that Castro-Caicedo could have joined. That testimony also provided context for decoding the recorded conversations between the alleged leader of the conspiracy and a coconspirator discussing that seizure. And, by doing so, the testimony aided the government in its effort to show that coded conversations involving Castro-Caicedo and others were, indeed, about cocaine trafficking. Finally, this testimony, by showing the large quantity of drugs dealt in by the conspiracy's leader, linked to the government's contention that the goal of the conspiracy was to send cocaine to the United States, as

other testimony suggested about two-thirds of South American cocaine goes there.

The challenged testimony about the other seizure -- consisting of 500 kilograms of cocaine -- indicated one of the coconspirators thought the DEA had seized the cocaine. (It was actually seized by a Colombian law enforcement agency.) Thus, this testimony assisted the government in advancing its theory that the conspirators intended to reach the U.S. market.

As precedent supports the relevance of this kind of evidence, see United States v. Díaz-Arias, 717 F.3d 1, 20-22 (1st Cir. 2013), and the District Court properly instructed the jury that Castro-Caicedo could be convicted only for his own state of mind and behavior, not for those of another, no further description of the challenged testimony's value is necessary to insulate it from Castro-Caicedo's late-breaking claims about lack of relevance and undue prejudice.[2]

## IV.

Castro-Caicedo also challenges testimony from a Colombian police officer about a polygraph test he took to join the DEA task force. In his testimony, the officer stated the polygraph was given

---

[2] Castro-Caicedo also argues on appeal that these shipments are irrelevant and unduly prejudicial for the further reason they actually were part of an entirely separate conspiracy for which he was not charged. But Castro-Caicedo has not carried his burden on plain error review of showing that the shipments were obviously part of a separate conspiracy, and thus we need not consider how his argument would fare if he had made such a showing.

"to make sure that the people working with the specialized group are the best possible on the team." That officer then went on to testify about a large seizure of cocaine belonging to a coconspirator and phone calls between Castro-Caicedo and other coconspirators.

On appeal, Castro-Caicedo concedes he did not object to this testimony below. But he argues allowing it was plain error. He references the concern we have expressed about polygraph evidence, see United States v. Mare, 668 F.3d 35, 42 (1st Cir. 2012) ("This is the latest in a growing line of cases that ought to suggest, if not a per se rule, then at least a code of best practice for the virtuous prosecutor: polygraph evidence, even that dealing with matters other than the actual results of an examination, is usually more trouble than it is worth."); United States v. Rodríguez-Berríos, 573 F.3d 55, 73 (1st Cir. 2009) (observing that "[p]olygraph results are rarely admissible at trial" due to concerns about their reliability and prejudicial effect), and he relies on precedent from another circuit that raises the particular concern that such testimony may constitute improper vouching or bolstering of a witness's credibility. See United States v. Ross, 703 F.3d 856, 875-76 (6th Cir. 2012).

The officer, however, made reference to the polygraph test only in passing, and the government did not bring it up again during testimony or in closing arguments. Castro-Caicedo has thus

-19-

not met the high burden required to show the testimony caused the prejudice necessary to warrant reversal on plain error review, especially considering the government's other evidence, including J.D.'s identification. See United States v. Rodriquez, 525 F.3d 85, 96 (1st Cir. 2008) ("The determination of whether [erroneously admitted] testimony was harmful [under the plain error test] demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the fact-finder's resolution of a material issue." (internal quotation marks omitted)).

## V.

Finally, Castro-Caicedo objects that his 300-month prison sentence is unreasonable because it unjustifiably varies upward from the guideline (and statutory mandatory minimum) sentence of 240 months, and the far-shorter sentences of his coconspirators.[3] We normally review substantive reasonableness challenges for an abuse

---

[3] Castro-Caicedo also objects that his 300-month prison sentence unreasonably deviated from the range of 168 to 210 months that would have applied under the Sentencing Guidelines but for the statutory mandatory minimum. But he does not dispute that the minimum applied because of his prior conviction for a felony drug offense. 21 U.S.C. §§ 851, 960(b)(1). And because the 240-month minimum exceeded the otherwise-applicable guideline range, the 240-month minimum became the guideline sentence. U.S.S.G. § 5G1.1(b).

-20-

of discretion. United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008). But because Castro-Caicedo failed to raise these objections in the court below, we review them only for plain error. United States v. Tavares, 705 F.3d 4, 33 (1st Cir. 2013).

When deviating from the Guidelines sentencing range, a sentencing judge must give reasons "rooted either in the nature and circumstances of the offense or the characteristics of the offender. In such a situation, the factors deemed relevant by the sentencing court must add up to a plausible rationale for the sentence imposed and must justify a variance of the magnitude in question." United States v. Flores-Machicote, 706 F.3d 16, 21 (1st Cir. 2013) (internal quotation marks and citations omitted). And here the District Court did offer such reasons and supply such a rationale.

The District Court concluded Castro-Caicedo's offense was "very serious" because his business was sending "large quantities" of cocaine from Colombia to the United States, with "devastating effect[s] on individuals, on families, on neighborhoods, on cities, states, and all of the United States." See 18 U.S.C. § 3553(a)(1), (a)(2)(A). The District Court also concluded Castro-Caicedo required an upward variance to deter him from future criminal acts and to protect the public, due to his several prior convictions for serious offenses and his failure to accept any responsibility during allocution for his present or past crimes. See id. § 3553(a)(2)(B), (C). And the District Court saw no aspects of Castro-Caicedo's

history or individual characteristics that warranted a lower sentence. See id. § 3553(a)(1).

Castro-Caicedo's other challenge to his sentence is no stronger. He complains his sentence is "more than four times longer than the sentence of any of the other co-conspirator[s,] including the leader [of the conspiracy]." He acknowledges all of the coconspirators pled guilty and several cooperated with the government, but he argues that "these factors still do not justify the district court's sentence." Our precedent, however, indicates otherwise, United States v. Ayala-Vazquez, 751 F.3d 1, 34 (1st Cir. 2014) (plea); United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005) (cooperation), and, as we have explained, "[a] well-founded claim of disparity . . . assumes that apples are being compared to apples." Mateo-Espejo, 426 F.3d at 514. Having failed to show he is plainly similarly situated to those who received lesser sentences, his unpreserved disparity claim must fail.

For these reasons, we affirm Castro-Caicedo's conviction and sentence.