# United States Court of Appeals
## For the First Circuit

No. 13-1471

ANTHONY COOPER,

Petitioner, Appellant,

v.

KARIN T. BERGERON,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Howard, Circuit Judges.

Jeanne M. Kempthorne for appellant.
Todd M. Blume, Assistant Attorney General, with whom Martha Coakley, Attorney General, was on brief, for appellee.

February 13, 2015

**HOWARD, Circuit Judge**. A Massachusetts jury found Anthony Cooper guilty of armed robbery and armed burglary, and the state trial judge found him to be a habitual offender, see Mass. Gen. Laws ch. 265, § 17; id. ch. 266, § 14; id. ch. 279 § 25. Sentenced to life in prison and unsuccessful in his direct appeal, Cooper sought federal habeas relief, alleging violations of his due process rights under the Fifth and Fourteenth Amendments. See 28 U.S.C. § 2254. In particular, he challenged the state appellate court's determination that the robbery and burglary victim's pretrial identification of his voice on a recorded telephone call was not tainted by an improperly suggestive police procedure, and its holding that his statements to the police were voluntary. The federal district court denied Cooper's habeas corpus petition. We affirm.

**I.**

We are required to presume that the Massachusetts Appeals Court's description of the facts is correct. 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002). Accordingly, we set forth the facts as drawn from that opinion. See Commonwealth v. Cooper, 878 N.E.2d 581, No. 06-P-329, 2007 WL 4571178 (Mass. App. Ct. 2007) (unpublished decision).

Late one night in February 2002, having been asleep on a couch in her Hingham, Massachusetts home, the victim awoke to find a man standing over her and in the process of putting his hands

-2-

over her eyes.  In the brief time before her vision was completely blocked, she saw that the intruder was wearing dark clothing, gloves and a hat.  He remained in the residence long enough to take her handbag before leaving.

Although the episode lasted no more than a minute, the man spoke to the victim repeatedly.  While still at the couch, he placed a shawl over her eyes and ordered her three times, "Don't get up.  Don't move, I have a knife."  He also asked her whether she had any money and twice asked if she was "okay."  When the victim pointed to her handbag, saying, "on my bed," the intruder instructed her, "Don't move, don't look up."  He retrieved the handbag and asked the victim her name, to which she replied, "Julie."  Returning to the couch, he rubbed her leg with his hand while commenting on her appearance:  "Julie, you're very pretty, you have a nice body."  In fear, the victim protested, "No, please just leave."  The man then stated, "Okay, I'm leaving.  Don't get up, don't call the police, I'll be watching you through the window."  She then heard him walk toward the door.  Once he had gone, she called the police, who arrived quickly, just before 2:00 a.m.

After scouting the area, police officers told the victim that they had noticed a car that "did not belong."  When they took her to the vehicle, she saw her black handbag lying on the ground next to it and some of her belongings spilled on the pavement.  She

-3-

also noticed that money was missing from her wallet and saw that her checkbook and portfolio case were inside the car, along with gloves and a knit hat apparently worn by the intruder.

Later that morning, Cooper called the neighboring Quincy police department and reported that his car had been stolen. The Quincy police immediately notified the Hingham police and also told Cooper to contact the Hingham police. Cooper did so and briefly spoke with a Hingham lieutenant about the purportedly stolen car. Both the exchange between the two departments and Cooper's subsequent call to Hingham were recorded by the Hingham police. We provide some detail about the contents of the recording, as they are central to Cooper's suggestiveness claim.[1]

The first call begins with a brief dialogue between a Quincy officer and a Hingham dispatcher, in which the former advises that, "we just ran a plate and it came back that you guys queried at two fifteen this morning, so I wondered if you guys wanted it for something?" He provides the license plate information and then states that the vehicle is an "'88 Olds Cutlass." The Hingham dispatcher confirms, "Yep, we're looking for him." The Quincy officer then informs the Hingham dispatcher that

---

[1] Our description is drawn from the tape in the record marked as "Exhibit 14," apparently from the trial itself, and the transcript of the tape marked as "Exhibit 2," apparently from the suppression hearing. We note that the trial transcript indicates that the jury received redacted versions of the tape and the transcript as trial exhibits, and that some portion of the tape was played for the jury during the victim's testimony.

the caller is "on the phone with us right now saying that he left his keys in his car and now it's not there."  The dispatcher, in turn, tells a Hingham police lieutenant of the Quincy report, during which laughter is heard in the background.  The call is then transferred to the lieutenant, and the recording continues with a conversation between the Quincy officer and the Hingham lieutenant.

The Quincy officer informs the lieutenant, "We have a gentleman on the other line right now . . . Anthony Cooper," and states, "He left his keys in his car and someone took it."  The dialogue continues:

[Hingham lieutenant:] What do you know?

[Quincy officer:] I know, huh, coincidence, isn't it?

[Hingham lieutenant:] Yeah, geeze I'm really shocked! I'm just shocked that it took him so long to call it in, I had a couple of conversations with his wife over that, she had no idea where he was, so, um, why don't you suggest to him strongly that he come to the Hingham Police and have some discussion with us this morning?

[Quincy officer:] You got it.

[Hingham lieutenant:] All right.

[Quincy officer:] We'll tell him to come down and see you.

[Hingham lieutenant:] I appreciate it.

At one point, the Hingham lieutenant may be heard laughing, and the tone of both police officers is aptly described as sarcastic at times.  The officers soon conclude their conversation.

The recording continues with a second phone call between a Hingham dispatcher and a male caller, Cooper. The caller states, "Yeah, I was just told to call down there," and, after being briefly put on hold, he informs the dispatcher, "Yeah, my car was stolen last night in Quincy . . . [a]nd I just reported it, I got into work and reported it . . . [a]nd they said that Hingham police want to talk to me." The dispatcher transfers the call to the Hingham lieutenant, who receives the stolen car report from the caller. The recording ends with the lieutenant encouraging Cooper to come to the police station, and it includes a reference by the lieutenant to Cooper's lengthy criminal record and a suggestion that a lawyer should accompany him.

The police arrested Cooper later that day, and a detective interviewed him after informing him of his Miranda rights. At the outset, the detective asked Cooper whether he was represented by counsel. Cooper replied that he was not and stated that he wanted to retain a lawyer "closer to home." At one point during the interview, the detective told Cooper that "if he did not speak with [the detective], he would see to it that D.S.S. [would take] his son away from his ex-wife." Cooper subsequently told the detective that he had been with a friend named Richard Parker the previous night.

On the day following Cooper's arrest, the victim brought some personal items to the police station, including her handbag.

-6-

While there, a police detective asked her to listen to a "911 tape" of someone reporting a stolen car. He did not identify the caller, nor did he tell her of any connection that the call may have had to the home invasion. At the detective's suggestion, she listened to the tape with her eyes closed. He played the recording from the beginning, when the Quincy police first contacted the Hingham police, and continued to play all of that call and the beginning of the call between Cooper and the Hingham police.

As soon as the victim heard the caller's voice on the recording, she immediately recognized it as belonging to the intruder. She opened her eyes, and, shaking, stated, "That's him, that's the guy." The detective turned off the tape once the victim identified the voice; she did not hear the last part of the recording during which the Hingham lieutenant commented on the caller's lengthy criminal record and the suggestion that he obtain legal counsel.

Before trial, Cooper sought to suppress all in-court and out-of-court identification evidence, as well as his post-Miranda statements to the police. These motions were denied, and the police recording (at least some portion of it, see supra n.1) and Cooper's statements to the detective were included in the evidence presented to the jury. The victim confirmed her out-of-court voice identification and repeated that identification in court after a portion of the tape was played before the jury. Among the other

evidence that the jury heard was testimony that, on several occasions, Cooper had called his friend Richard Parker and instructed him to confirm Cooper's alibi story with law enforcement. The jury found Cooper guilty of armed robbery and armed burglary, and the trial judge subsequently determined that he was a habitual offender, which required that he be sentenced to a maximum term on the substantive counts. See Mass. Gen. Laws ch. 279, § 25.

On direct appeal, the Massachusetts Appeals Court rejected Cooper's state and federal constitutional challenges to the admission of the voice identification and of his post-Miranda statements. Cooper, 878 N.E.2d 581, 2007 WL 4571178, at *3-4. The court concluded that the victim's voice identification was properly admitted, because it was "based solely on her recognition of the intruder's voice, with no possible improper suggestions by any police officers." Id. at *3. The court also concluded that the trial court properly found that Cooper's statements to the police were voluntary. Id. at *4. It did so after considering the surrounding circumstances, including that Cooper had provided the police "a self-serving statement concerning his alibi." Id.[2]

_____

[2] Analyzing this claim under the Massachusetts Constitution, the court required proof beyond a reasonable doubt, rather than by a preponderance of the evidence as required by the U.S. Constitution, that the defendant voluntarily waived his Miranda rights or voluntarily made a confession. See Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); Commonwealth v. Tavares, 430 N.E.2d 1198, 1206 (Mass. 1982).

Noting the representation that the detective made to Cooper about the Department of Social Services (DSS)removing his child from his former spouse, the court stated that, while "concern for a loved one may, in certain circumstances, render a confession involuntary," the record was "devoid of any unfair tactics, illegitimate police conduct, or psychological coercion." Id. (quoting state cases) (alterations omitted). The Supreme Judicial Court of Massachusetts denied further appellate review. See Commonwealth v. Cooper, 881 N.E.2d 1141 (Mass. 2008) (Table). Cooper then pursued § 2254 federal habeas relief, and the district court adopted a magistrate judge's recommendation to deny the petition.

## II.

Our review of the district court's decision is de novo. Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013); Clements v. Clarke, 592 F.3d 45, 51 (1st Cir. 2010).

A petitioner seeking relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), must complete a steep climb. See Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254); see Johnson v. Williams, 133 S. Ct. 1088, 1094 (2013); Harrington v. Richter, 131 S. Ct. 770, 786 (2011). When a claim previously has been adjudicated on the merits by a state court, a petitioner must show that the decision was contrary to clearly established federal law as determined by the Supreme Court

of the United States, or involved an unreasonable application of such definitive federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Only a legal or factual error that is objectively unreasonable will warrant relief. See White v. Woodall, 134 S. Ct. 1697, 1702 (2014); Burt v. Titlow, 134 S. Ct. 10, 15 (2013); see also Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014). By contrast, AEDPA constraints do not apply where a state court decision does not resolve a federal claim that was presented to it, and a habeas court will afford de novo review to the claim. Hodge v. Mendonsa, 739 F.3d 34, 41 (1st Cir. 2013); Clements, 592 F.3d at 52.

In this case, the petitioner accepts that his § 2254 due process challenge to the admissibility of his post-Miranda statements is subject to AEDPA review, and he argues that the state court decision constitutes an unreasonable application of clearly established federal law. With respect to his voice identification due process claim, however, Cooper contends that AEDPA review applies only in part. He argues that the state court's ruling on the propriety of the voice identification procedure rests on an unreasonable determination of the facts and constitutes an unreasonable application of clearly established federal law. But he seeks de novo review on the ultimate constitutional question of the reliability of the identification which, he contends, the state

court did not reach.  As we will explain, we are required to afford AEDPA deference across the board in this case.

## A.  Voice Identification

The admissibility of an identification may be called into question when the police have used a highly suggestive procedure in asking an eyewitness to identify an individual, such as presenting photographs only of the suspect or having the suspect "show up" alone.  See Manson v. Brathwaite, 432 U.S. 98, 112, 117 (1977); Neil v. Biggers, 409 U.S. 188, 196-200 (1972); see also Stovall v. Denno, 388 U.S. 293, 302 (1967) (plurality opinion), overruled on other grounds by Griffith v. Kentucky, 497 U.S. 314 (1987). Nevertheless, the admission of evidence relating to an impermissible or unduly suggestive procedure that gives rise to the risk of an unreliable identification does not, by itself, establish a due process violation.  See Brathwaite, 432 U.S. at 109-14; Biggers, 409 U.S. at 198-200; see also United States v. Castro-Caicedo, No. 13-1046, 2014 WL 7331738, at *3-5 (1st Cir. Dec. 24, 2014).  Ordinarily, such evidence is tested before the jury by being exposed to cross-examination.  Brathwaite, 432 U.S. at 113 n.14; Castro-Caicedo, No. 13-1046, 2014 WL 7331738, at *2.  Due process demands that evidence be excluded from a criminal trial only when the identification procedure employed was so impermissibly suggestive as to give rise to "a very substantial likelihood of irreparable misidentification." Biggers, 409 U.S. at

-11-

198 (internal quotation marks omitted); see also Brathwaite, 432 U.S. at 114, 116; Simmons v. United States, 390 U.S. 377, 384 (1968); Stovall, 388 U.S. at 302.

Fundamentally, "reliability is the linchpin in determining the admissibility of identification [evidence]," Brathwaite, 432 U.S. at 114, and the Supreme Court has identified a number of factors for evaluating the totality of the circumstances when answering the reliability question. See id. at 114-17; Biggers, 409 U.S. at 199-200. They include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Brathwaite, 432 U.S. at 114; see Biggers, 409 U.S. at 199-200. "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Brathwaite, 432 U.S. at 114. This calculus involves a mixed question of law and fact. Sumner v. Mata, 455 U.S. 591, 597 (1981).[3]

In a habeas case such as this, we apply these principles in the context of § 2254's review standards and, as noted earlier, Cooper asks us to use a two-tiered standard of review: deferential

_____

[3] The cases typically address evidence tied to visual pretrial identification. The parties do not suggest a different standard for assessing voice identification evidence. See United States v. Gilbert, 181 F.3d 152, 163 (1st Cir. 1999) (applying Brathwaite holding to vo ice identification procedures).

review of the state court ruling that the voice identification procedure was not impermissibly suggestive, but de novo review on the ultimate constitutional question of reliability. He builds his case for de novo review on what he describes as the "extraordinar[il]y" and "astonishingly" suggestive content of the tape.[4] We reject this two-tiered construct, because we read the state court's decision as having adjudicated the merits of the reliability question, and it is therefore entitled to AEDPA deference.

"AEDPA's trigger for deferential review is adjudication, not explanation," and "[i]t is the result [reached by the state court] to which we owe deference, not the opinion expounding it." Clements, 592 F.3d at 55-56; see Richter, 131 S. Ct. at 784 (AEDPA review is not dependent on a state court opinion that explains its reasoning, nor on citation to or even awareness of Supreme Court precedent). A federal claim is deemed adjudicated on the merits by a state court where the decision finally resolves "the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."

---

[4] Cooper also argues that the state court decision rests on a clearly erroneous finding of historical fact regarding the chronology of the criminal investigation. See 28 U.S.C. § 2254(d)(2). The state court's analysis, however, demonstrates clearly that it fully understood that Cooper had been arrested before the victim visited the police station. See Cooper, 878 N.E.2d 581, 2007 WL 4571178, at *3. No further attention to this issue is warranted.

Clements, 592 F.3d at 52 (internal quotation marks omitted); see also Johnson, 133 S. Ct. at 1097 (noting that adjudication "on the merits" under AEDPA connotes that the state court heard and evaluated the evidence and the substantive arguments, and then resolved the dispute). Cooper does not dispute the broader prerequisites of substantive decision and res judicata effect. Rather, he argues that the state court's substantive decision rested solely on a finding that the procedure itself was not impermissibly suggestive. But, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85; see Johnson, 133 S. Ct. at 1094-96. Cooper attempts to overcome this presumption with a skewed reading of the state court's decision that we must reject.[5]

---

[5] Cooper analyzes the state court's decision using the two-tiered due process framework set forth in our direct review precedent. See, e.g., United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009) (considering (1) whether the identification procedure was impermissibly suggestive, and (2) if so, whether the identification was reliable notwithstanding the suggestiveness of the procedure, considering the totality of the circumstances). It is the Supreme Court's authority, however, that sets the benchmark for the federal due process question. See Lopez v. Smith, 135 S. Ct. 1, 3-4 (2014). Relatedly, when scrutinizing the state court's decision, we are mindful that Massachusetts abides by the per se exclusionary approach for pretrial identification procedures which are unnecessarily suggestive. See Commonwealth v. Johnson, 650 N.E.2d 1257, 1259-65 (Mass. 1995).

The impact that the playing of the portion of the tape containing the police dialogue may have had on the reliability of the victim's voice identification was front and center throughout the state court proceedings. The Massachusetts Appeals Court directly confronted the argument that the admission of the voice identification evidence violated Cooper's due process rights under the state and federal constitutions because the content of the tape rendered the procedure excessively suggestive and conducive to mistaken identification. Cooper, 878 N.E.2d 581, 2007 WL 4571178, at *3. The legal framework anchoring the Appeals Court's analysis plainly included the key constitutional question of reliability. See id. Indeed, the court cited Massachusetts cases that discuss reliability in the context of Stovall, Biggers, and Brathwaite. See Commonwealth v. Torres, 327 N.E.2d 871, 874 (Mass. 1975); Commonwealth v. Pacheco, 421 N.E.2d 1239, 1245-46 (Mass. App. Ct. 1981).[6]

The state court's reliance on Pacheco, in particular, demonstrates that it was intending to address reliability in accord with Biggers and Brathwaite when resolving the federal constitutional claim. In his direct appeal, Cooper took the position that, for both his state and federal claims, the Appeals

_____

[6] That the state court expressly cited only state case law is of no moment. See Clements, 592 F.3d at 54 ("The real question is not whether the state court opinion cited to any federal cases, but whether the opinion addresses a fairly raised federal issue."); see also Johnson, 133 S. Ct. at 1095-96.

-15-

Court "should consider" the Biggers factors to rule that the totality of the circumstances were insufficient to overcome the extraordinary suggestiveness of the police procedure. The Commonwealth, by contrast, argued that resolution of the state constitutional claim depended solely on the quality of the identification procedure "without recourse to a secondary analysis of witness certainty or reliability." See Commonwealth v. Johnson, 650 N.E.2d 1257, 1259-65 (Mass. 1995) (declining to align with the holding in Brathwaite). Faced with these arguments, the Massachusetts Appeals Court explicitly followed Pacheco, a case which had resolved a defendant's federal and state due process claims by relying on the federal reliability and the state independent source formulations. See Pacheco, 421 N.E.2d at 1246 & n.12 (examining the totality of the circumstances to conclude that the pretrial identification bore "sufficient indicia of trustworthiness to satisfy either the reliability test formulated in the Biggers-Brathwaite cases or the independent source standard stated in the [SJC's] Botelho-Venios decisions"). The Appeals Court ultimately held that "viewing the totality of the circumstances, the 911 call reporting the stolen car was properly admitted because the victim's identification was based solely on her recognition of the intruder's voice, with no possible improper suggestions by any police officers." Cooper, 878 N.E.2d 581, 2007 WL 4571178, at *3.

-16-

The Massachusetts Appeals Court's decision, therefore, gives adequate and sufficiently clear indicia that addressing the reliability question was at the heart of its resolution of the federal due process claim. See Hodge, 739 F.3d at 41, 42 (determining whether there were "adequate" and "sufficiently clear" indicia that a claim had been adjudicated on the merits); see also Clements, 592 F.3d at 55 (noting that only "[w]hen a state court has truly avoided (or merely overlooked) the petitioner's federal claim" may a federal court "step into the breach and review de novo"; "judicial opacity is a far cry from judicial avoidance").

Cooper points us to language in the state court's decision reflecting a conclusion that it found a lack of suggestiveness in the procedure. See, e.g., Cooper, 878 N.E.2d 581, 2007 WL 4571178, at *3 n.2 (remarking in a footnote that "there was nothing improperly suggestive when the 911 call was transferred between police officers"). This parsing, however, overlooks that the state court plainly chastened the police for its poor identification procedure. See id. at *3 & n.2 (expressing concern over the use of "a single taped voice," and also stating that excising "superfluous conversations" of the recorded police dialogue would have been "the better practice"). The constitutional question does not ultimately turn on finding an imperfect or inappropriate police practice, and the state court thus sharpened the point to whether any impropriety relating to the

procedure irreparably infected the victim's certain recognition of the intruder's voice from her own recollection. See, e.g., Brathwaite, 432 U.S. at 114-17 (though "it would have been better" for the police to include additional photograph samples, the identification evidence was reliable and properly admitted at trial); Simmons, 390 U.S. at 384-86 (same holding on reliability, while recognizing that the identification procedure "may have in some respects fallen short of the ideal").

We are required to read the state court's decision pragmatically, Johnson, 133 S. Ct. at 1095-96, and, through this lens, we are to determine what arguments or theories supported the state court's decision on the merits, Richter, 131 S. Ct. at 780, and then apply AEDPA's objective reasonableness standard to those arguments or theories. While in this case the state court rejected Cooper's characterization of the tape as insurmountably suggestive, we are persuaded that it answered the federal reliability question in the context of a less-than-ideal identification procedure. Even if we were not persuaded so, we are to presume that there was a merits determination on the reliability claim that was presented to the state court, and to afford deferential AEDPA review. See Richter, 131 S. Ct. at 784-85; Hodge, 739 F.3d at 42.

Cooper primarily faults the state court for rejecting his position that the single-voice identification procedure was

extraordinarily suggestive, given the tape's content. Focusing on the police dialogue heard by the victim, Cooper contends that the state court ignored or dismissed important surrounding facts when discounting its import. He points out that: his name was used during the dialogue; the police noted that the caller's wife did not know of her husband's whereabouts the night before; the police clearly and caustically communicated their disbelief of the caller; the call involved a stolen car report and the victim had just seen an abandoned car in relation to the crime; and the victim knew that a suspect already was in police custody. Taken together, he argues, "[i]t is difficult to imagine a more suggestive voice identification procedure or more egregious set of facts," since the police "all but used a megaphone to broadcast their belief in Cooper's guilt" to the victim.

While the police dialogue undeniably communicates disbelief about the caller's report, the record would not compel all reasonable jurists to conclude that the tape's content renders any subsequent voice identification unreliable. For example, despite the fact that the police identified the caller's name as "Anthony Cooper," the record provides no basis to infer that the victim had any idea at the time that she listened to the tape that a person by that name had anything to do with the home invasion. Indeed, the state court noted that when initiating the identification procedure, the detective never mentioned that the

tape was of the petitioner or that the police had arrested the individual on the tape.  Further, the record allows the conclusion that the detective did not draw a connection for the victim between the car found at the scene some sixty hours earlier and the caller's stolen car report, and it is not a foregone conclusion (as the petitioner suggests) that the victim held her general awareness of the car from the scene in the forefront of her mind at the time that she listened to the taped call.  Moreover, the description of the vehicle on the tape was vague, the stolen car was not connected to any particular geographical location, and the stolen car report itself was not grounded in any time frame which temporally tied it to the crime against the victim.

Admittedly, it is possible to align words in the printed transcript of the tape with particular chronological facts, in order to extract potential inferences and connections between the home invasion and the caller -- whom the police clearly did not believe.  Whether or not we would reach the same conclusion as did the state appeals court were this a direct appeal, however, the points that are particularly provocative to Cooper simply are not enough to establish under AEDPA that the state court's more diminished view of the import of the tape's content was objectively unreasonable.

As well, as we have taken pains to point out, a broader panorama undergirds the state court's decision on the reliability

of the victim's identification.  More specifically, the record on the motion to suppress allowed the state court to conclude the following based on the totality of the evidence.  See Biggers, 409 U.S. at 199-200 (setting forth reliability factors); see also Richter, 131 S. Ct. at 784 (a petitioner must show "there was no reasonable basis for the state court to deny relief . . . whether or not the state court reveals which of the elements in a multipart claim it found insufficient").

The victim had a meaningful opportunity to discern the intruder's voice.  During the commission of the crime, he repeatedly spoke to her while positioned closely to her, using a variety of phrases, questions, and commands.  Also, the victim was not a casual observer during the incident; she had her eyes closed and was alone in her home with the intruder during the concentrated, disturbing event.  The victim told the police that she would recognize the voice if she heard it again, and, then, when she later listened to the tape, her identification of the perpetrator's voice instantaneously followed the caller's first utterance. Moreover, her immediate recognition was accompanied by a telling emotional display; as the detective explained, she was shaking when she recognized the caller's voice as that of the intruder.  Also, the victim listened to the tape within approximately sixty hours of the crime, which ordinarily would not be enough of a time lapse to result in much memory fade about the

frightful event. This is enough to prevent us from concluding that the state court's reliability decision was objectively unreasonable.

Cooper responds, however, that the victim's own testimony during the suppression hearing shows that at the time that she listened to the tape, she was aware of a "strong possibility" that the caller was the person responsible for the intrusion. Her testimony, however, was not so unambiguous. Cf. United States v. Espinal-Almeida, 699 F.3d 588, 602-03 (1st Cir. 2012) (circumstances surrounding the witness' viewing of photographs of suspects may be pertinent to "whether there was any unnecessarily suggestive identification procedure that preceded the identification").

Under cross-examination at the hearing, the victim did not acquiesce to defense counsel's persistent questioning about whether she had a "strong sense" that the voice she was asked to hear belonged to the intruder: "I think it was going to be a possibility. It could have been the person who stole the car[,] too. I mean, I was just listening to see if I could identify the voice"; "I was just listening to the voice to see if I could recognize it." She also testified that the police detective did not connect the caller to the home invasion suspect, telling her only that the tape involved a recording a stolen car report. Moreover, she explained that while she was listening to the tape,

-22-

she did not connect the purportedly stolen car to the vehicle that she had seen on the night of the crime; she did not focus on the content of any dialogue but centered her attention on whether she could recognize a voice; and she kept her eyes closed during the playing of the tape, a method which she testified helped her concentrate on the caller's voice. Finally, and importantly, there is not even a hint throughout her testimony that the Hingham detective ever exerted any pressure on her to make a positive identification or otherwise cued her before or during the playing of the tape.

Cooper, nonetheless, protests that the state court neglected to consider whether any exigent circumstances justified the use of the suggestive tape or the single-voice procedure. He relies on Brathwaite and Stovall, but neither authority helps him. Brathwaite established that federal due process does not compel the exclusion of evidence obtained by a police procedure that was both suggestive and unnecessary, apart from any consideration of reliability. 432 U.S. 109-14. Stovall had previously established that, where exigent circumstances are present, such circumstances may excuse the use of an inherently suggestive identification procedure. 388 U.S. at 302; see Biggers, 409 U.S. at 198-99 (declining to adopt a per se rule that "unnecessary suggestiveness alone requires the exclusion of evidence"). Cooper does not point to any Supreme Court precedent holding that a court is required to

evaluate the presence or absence of exigency when determining the crux of the matter, reliability.  Cf. Biggers, 409 U.S. at 198 ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." (emphasis added)).  Nor does he point to any Supreme Court case holding that evidence derived from a procedure with a suggestive feature was unreliable due to the lack of exigency.

As his last stand, Cooper contrasts this case with an array of federal cases in which, inter alia, the identifying witness had greater occasion to interact with an individual, had prior knowledge of the person, had particularly acute observation skills, had described the individual prior to participating in the identification procedure, and had identified the person within hours of the underlying event.[7] Each circumstance is meaningful in its own right, and especially so when taken together.  It is not uncommon, however, for a witness identification to involve an unduly suggestive procedure, as well as other circumstances that may weaken the accuracy of the witness's recall, that -- when

_____

[7]  See United States v. Henderson, 320 F.3d 92, 100-01 (1st Cir. 2003); United States v. Flores-Rivera, 56 F.3d 319, 330-31 (1st Cir. 1995); United States v. de Jesus-Rios, 990 F.2d 672, 677 n.6 (1st Cir. 1993); United States v. Fields, 871 F.2d 188, 195-96 (1st Cir. 1989); Velez v. Schmer, 724 F.2d 249, 252 (1st Cir. 1984).

-24-

viewed on the whole -- nevertheless do not undermine the reliability of the evidence for purposes of admitting it at trial for the jury to decide its weight. See, e.g., United States v. Henderson, 320 F.3d 92, 100-01 (1st Cir. 2003) (a lapse of several months and the witness's varying physical descriptions did not undermine the reliability of the in-court identification given other strong indicia of reliability). In short, the cases that the petitioner cites are not roughly comparable in a way that prompts any concern about state error, let alone objectively unreasonable error under AEDPA standards.

Ultimately, the state court's decision that the evidence was sufficiently reliable for the jury's consideration involves the type of constitutional calculus established by the Supreme Court that permits a fair amount of latitude in the exercise of sound decisional judgment.[8] See Richter, 131 S. Ct. at 786. Even if

---

[8] We note that the Supreme Court cases on which Cooper relies could also be read to cut against him. See Brathwaite, 432 U.S. at 114-17 (though "it would have been better" for the police to include additional photograph samplings, the identification was reliable because, inter alia, the eyewitness clearly observed the defendant, the witness was not a "casual or passing observer," the identification was certain and within two days of the crime, and no police pressure was exhibited during the procedure); Biggers, 409 U.S. at 200-01 (though pretrial identification comprised a show up which is inherently suggestive, the identification was reliable because, inter alia, the eyewitness had a meaningful opportunity to view the assailant's features during the crime, their interaction was in close proximity and in good lighting, the eyewitness was not a "casual observer" but a victim of a traumatic crime, and her identification was certain); Simmons, 390 U.S. at 384-86 (though identification procedure "may have in some respects fallen short of the ideal," the identification was reliable because, inter alia,

some might see this case as presenting a close question, such a threshold is not enough to warrant habeas relief. See Morgan v. Dickhaut, 677 F.3d 39, 47 (1st Cir. 2012). In sum, Cooper has not carried his heavy burden of establishing some "extreme malfunction" in the state court's decision, to warrant § 2254 relief. Titlow, 134 S. Ct. at 16.

## B. Post-Miranda Statements

A "confession obtained by police through the use of threats is violative of due process" and "the question in each case is whether the defendant's will was overborne at the time he confessed." Haynes v. Washington, 373 U.S. 503, 513 (1963) (internal quotation marks omitted); see also Moran v. Burbine, 475 U.S. 412, 421 (1986). "[T]he true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort," which requires "an examination of all of the attendant circumstances." Haynes, 373 U.S. at 513 (internal quotation marks omitted); see Lynumn v. Illinois, 372 U.S. 528, 534 (1963). The Supreme Court has identified several factors for evaluating whether a confession was voluntarily made, and any coercive effect of police statements that exploit an individual's familial relationships may be part of the calculus. See United

the eyewitnesses had a good opportunity to see the perpetrators during the crime, the procedure occurred only one day after the crime when the witnesses' memories were fresh, the witnesses were not pressured by the police, and they were certain in their recollection).

States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011) (summarizing factors under Supreme Court precedent for "conduct[ing] the juridical equivalent of an archeological dig into the whole of the circumstances"); see also Lynumn, 372 U.S. at 534 (considering familial threats made by police as part of the totality); United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) ("A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary.").

Ultimately, the voluntariness inquiry is a mixed question of law and fact, see United States v. Gaudin, 515 U.S. 506, 525 (1995) (Rehnquist, C.J., concurring); Miller v. Fenton, 474 U.S. 104, 112 (1985), and it is one that is understood as allowing sound jurisprudential judgment within fairly wide margins, see Haynes, 373 U.S. at 515. In light of the deference due state courts under AEDPA, we are thus, again, required to give considerable leeway to the state court's resolution of the federal constitutional question. See Richter, 131 S. Ct. at 786.

Cooper contends that the state court's conclusion that he voluntarily spoke to the police constitutes an unreasonable application of clearly established Supreme Court authority, particularly in light of the detective's threat to remove his child from the mother's custody. Even though his statements to the police do not amount to a confession, he underscores that his statements led law enforcement to inculpatory evidence that was

-27-

used at trial to support an inference of consciousness of guilt; namely, the evidence of his post-arrest conversations with Parker in which Cooper pressured his friend to stick to the alibi story. He challenges the state court's decision that his post-Miranda statements were voluntary on three grounds. None clear AEDPA's high hurdle.

Cooper first argues that the state court adopted a "completely unreasonable conclusion" that the detective's threat about DSS did not constitute illegitimate police action. This contention misreads the thrust of the state court's decision. The court's analysis shows that it considered the impact of the detective's exploitation of the parent-child relationship in light of other circumstances that evinced Cooper's clear-mindedness in his interaction with the police. For example, when affirming the state trial court's voluntariness analysis, the Massachusetts Appeals Court emphasized Cooper's calm demeanor, his status as a "seasoned career criminal [who was] unlikely to succumb to fear and intimidation," the multiple Miranda warnings given to him, and his discussion with the detective about his intention to hire an attorney. Indeed, the record on the motion to suppress before the state trial court shows that Cooper had been interviewed by law enforcement more than ten times during his life and that he had provided post-Miranda statements to the police on several occasions. As for the DSS threat itself, the state court's

-28-

decision is properly cast as concluding that the police threat did not effect the sort of psychological coercion on Cooper that would tip the balance away from the other indicia that he had made his statements voluntarily. In short, we disagree with Cooper's reading of the state court's decision that it "failed to afford the threat to remove [his] child from [the mother's] home any weight in the balance."[9]

The second ground advanced by Cooper is that the state court's reliance on the self-exonerating nature of his alibi statement conflicts with clear Supreme Court authority. According to Cooper, Rogers v. Richmond, 365 U.S. 534 (1961), and United States v. Bram, 168 U.S. 532 (1897), foreclose a court from considering, in any manner, the content of a defendant's statement procured by the police when assessing whether the statements were made voluntarily. A proper understanding of this precedent and the state court's reasoning here shows no conflict.

In Rogers, the Court held that the admissibility question focuses on "whether the behavior of the State's law enforcement officials was such as to overbear [a criminal defendant's] will to resist and bring about confessions not freely self-determined" -- an inquiry which must "be answered with complete disregard of

---

[9] Despite Cooper's reliance on isolated circuit authority to posit a specific rule that illegitimate police action renders statements involuntary as a matter of law, we must remain fixed on Supreme Court precedent. See Lopez, 135 S. Ct. at 3-4.

-29-

whether or not [the individual] in fact spoke the truth."  365 U.S. at 544; see Jackson v. Denno, 378 U.S. 368, 384-85 (1964) ("[P]roof that a defendant committed the act with which he is charged and to which he has confessed is not to be considered when deciding whether a defendant's will has been overborne.").  It particularly foreclosed consideration of the "probable truth or falsity" of the statement itself, Rogers, 365 U.S. at 543, rather than any type of evaluation of a statement's content, as Cooper proposes.

Bram is similar.  There, the Court held that a defendant's statements to police that did not evince a clear confession still must have been uttered voluntarily in order to be admissible against him at a criminal trial.  168 U.S. at 541-42; see Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991) (post-Bram precedent setting forth the standard for determining voluntariness of a confession). "Having been offered as a confession, and being admissible only because of that fact, a consideration of the measure of proof which resulted from [the statements to the police] does not arise in determining its admissibility."  Bram, 168 U.S. at 541.  Again, the Court's decision forecloses only a particular type of consideration of the statement's content and does not embody the all-encompassing holding that Cooper desires.

The state court's decision here neither evaluated the truth or falsity of Cooper's statement (whether he indeed was with his friend Parker at the time of the home invasion), nor calculated

-30-

the measure of proof that would have been provided by the statement at trial. Rather, the state appeals court considered Cooper's capacity to provide "a self-serving statement concerning his alibi" as one component in assessing whether the DSS threat had a coercive effect on him. See Cooper, No. 06-P-329, 2007 WL 4571178, at *4. Indeed, the state court had the record of the suppression hearing before it, in which Cooper was asked outright how the DSS threat affected him during the interview. He testified that he felt "overwhelmed" and "was totally out of it at that point for a few short seconds," because he had "put [his] son through a lot in his young life [and] would rather go to jail for something [he] didn't do than to let them go to [his son] and take him away from his mother." His subsequent statement to the detective, however, was not an effort to appease the officer by implicating himself at all but, as the state trial court found, Cooper instead "prevailed over the officer by providing a self-serving, exculpatory account." On this record, we conclude that the state court's consideration of the self-serving statement when assessing whether the petitioner's will was overborne as he testified, or whether he spoke with the detective of his own free will, was objectively reasonable. See Thompson v. Keohane, 516 U.S. 99, 113 (1995) (noting that credibility determinations for the voluntariness inquiry may be pertinent "to the establishment of historical fact and thus to the identification of the 'totality of the circumstances'").

-31-

Finally, Cooper takes aim at the state court's assessment of the totality of the circumstances, itemizing aspects of the case that he believes the Massachusetts Appeals Court missed.[10] As best we can tell, he grounds his claim in the Supreme Court's decision in Lynumn, 372 U.S. 528. Although Lynumn bears some surface similarities to this case in that both involve police statements exploiting the parent-child relationship, their likeness ends there. The defendant in Lynumn had no prior experience with law enforcement, she was alone in her apartment encircled by three police officers and a convicted felon when she confessed, and, in addition to threats about her child's provisional care, the police also repeatedly told her that the felon had "set her up" and that they would "go light with her" if she confessed. 372 U.S. at 533-34. Moreover, as discussed earlier, the state court here identified several factors showing that Cooper was not particularly susceptible to police manipulation nor overcome by the DSS threat itself.

Simply put, we are hard-pressed to see the state court's decision on voluntariness as engendering much fairminded

---

[10] While Cooper sees his discussion with the police detective about retaining an attorney and his minimal formal education as cutting against voluntariness, he does not claim that the detective ignored a request for legal counsel. See, e.g., James v. Marshall, 322 F.3d 103, 108 (1st Cir. 2003) (reviewing Supreme Court precedent establishing that the police must scrupulously honor a suspect's right to remain silent and cease all questioning once that individual unequivocally requests legal counsel).

disagreement at all,[11] let alone constituting a holding that is objectively unreasonable under AEDPA.  See Titlow, 134 S. Ct. at 15-16; Richter, 131 S. Ct. at 786, 788.

## III.

The petitioner has failed to establish that he suffers illegal confinement; accordingly, we **affirm** the denial of his § 2254 petition.

---

[11] See, e.g., Jacques, 744 F.3d at 808, 812  (upholding ruling that a single statement by law enforcement about the defendant's father's failing health suggesting that "continued resistance might deprive [him] of crucial years with his family" did not have a coercive impact where, inter alia, his demeanor "did not manifest any notable psychological or emotional anxiety in response to [the police] statement," and there were no indicia that he "was particularly susceptible to manipulation").